1            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

   _____

3

   UNITED STATES OF AMERICA

4
                      Plaintiff

5

            vs.         Criminal Action No. 05-11E

6

   KENNETH FLEETWOOD,

7  A/K/A MICHAEL R. JOHNSON

8                    Defendant

   _____

9

10                   PROCEEDINGS

11       Transcript of suppression hearing commencing on
   Wednesday, October 12, 2005, United States District Court,

12  Erie, Pennsylvania, before Honorable Maurice B. Cohill, Jr.,
   District Judge.

13
   APPEARANCES:

14
   For the Government:      US Attorney's Office

15                    By:  Marshall J. Piccinini, Esq.

16  For the Defendant:      Federal Public Defender
                      By:  Thomas Patton, Esq.

17

18                    Reported by:
                      Michael D. Powers, RMR

19                 Official Court Reporter
                   Room 5335 USPO & Courthouse

20                 Pittsburgh, Pennsylvania 15219

(412) 208-7572

21

22  Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

23

24

25

2

1              I N D E X

2  GOVERNMENT WITNESSES    DIRECT  CROSS  REDIRECT  RECROSS

3  ERIC WAGNER

4    By Mr. Piccinini      3          53
                      78
5                      153

6    By Mr. Patton        19          64
                      80
7                      160

8  ROYCE SMITH

9    By Mr. Piccinini    82          102
     By Mr. Patton        89          105
10
    DEFENDANT WITNESSES    DIRECT  CROSS  REDIRECT  RECROSS
11
    ADRIANNA HAVELKA
12
     By Mr. Patton      106          143
13    By Mr. Piccinini        123

14  JOHN TOWNLEY

15   By Mr. Patton          145
     By Mr. Piccinini            149

16

17

18

19

20

21

22

23

24

25

3

1          P R O C E E D I N G S

2   (Court convened on Wednesday, October 12, 2005,

3   at 9:00 a.m.)

4          THE COURT:  Good morning.  Be seated, please.

5          MR. PICCININI:  Good morning, Your Honor.

6          MR. PATTON:  Good morning, Your Honor.

7          THE COURT:  This is the time set for a hearing on

8   defendant's motion to suppress in this case, which is

9   United States against Kenneth Fleetwood, also known as

10   Michael R. Johnson, Criminal No. 05-11 Erie.

11         So, I assume the correct procedure would be to have

12   the government proceed.  Mr. Piccinini.

13         MR. PICCININI:  Thank you, Your Honor.

14         At this time, I would call to testify Trooper Eric

15   Wagner from the Pennsylvania State Police.

16         THE COURT:  Would you come forward here and be

17   sworn, please?

18         THE CLERK:  Raise your right hand.

19               * * * * *

20         ERIC T. WAGNER, having first been duly sworn,

21   testified as follows:

22         THE COURT:  Have a seat up here, please, give us

23   your name and spell your last name.

24         THE WITNESS:  Yes, sir.  It's Eric, T. Wagner.

25   W-a-g-n-e-r.

4

1         THE COURT:  Thank you.

2               DIRECT EXAMINATION

3   BY MR. PICCININI:

4   Q   Sir, how are you employed?

5   A   I am a Pennsylvania State Police Trooper.

6   Q   And how long have you been employed in that capacity?

7   A   Approximately fifteen years.

8   Q   And during the fifteen years, can you indicate to

9   Judge Cohill what's been the nature of your experience as a

10   Pennsylvania State Police Trooper?

11   A   Yes, sir.  For a little over two years, I worked in a

12   Patrol Unit at Troop I, Erie headquarters.  And for the past

13   twelve and a half years or so, I have been assigned to the

14   Bureau of Drug Law Enforcement, Drug Investigation Unit.

15   Q   Okay.  And during your time as a patrol officer, can you

16   generally briefly describe what your responsibilities were as

17   a trooper in the Patrol Division?

18   A   Your primary duties are to make traffic enforcement,

19   whether it's through radar or other traffic violations, as

20   well as also assigned criminal investigative duties.

21   Q   In your responsibilities with the Bureau of Drug Law

22   Enforcement, have you been deputized as a special federal

23   officer, and are you a member of the FBI's Erie Area Gang Law

24   Enforcement or EAGLE Task Force?

25   A   Yes.

5

1   Q    And how long have you been with the EAGLE Task Force?

2   A    I have been affiliated with the EAGLE Task Force since

3   1996, and I have been assigned several different times over

4   that nine-year period.

5   Q    And are you currently a member of the EAGLE Task Force?

6   A    Yes, sir.

7   Q    And were you employed in that capacity or assigned to

8   that unit back on March 2nd, 2005?

9   A    Yes, sir.

10   Q    And if I can draw your attention back to March 2nd,

11   2005, on that particular date were you conducting an

12   investigation concerning drug activity in and around the area

13   of East 14th Street and June Street?

14   A    Yes, sir.

15   Q    Can you indicate to Judge Cohill prior to March 2nd,

16   2005, what drug investigative activity led you to be

17   conducting your investigation at that vicinity on March 2nd?

18   A    Pertaining to the East 14th Street address, the -- we

19   received information that several black males from the

20  Cleveland, Ohio area were dealing cocaine from that area.

21      And pertaining to the June Street location, the

22  EAGLE Task Force had conducted, in January of 2005, a

23  controlled purchase of cocaine from that residence.

24  Q   Okay.  And the residence with regard to the controlled

25  purchase of cocaine on June Street, would that have been in

6

1  the vicinity of 2125 June Street?

2  A   Yes, sir, that would be correct.

3  Q   And a controlled purchase is a situation in which you

4  use a confidential informant to send them to the location, to

5  the residence for the purpose of purchasing, in this case,

6  crack cocaine?

7  A   That is correct.

8  Q   And in your experience as a member of the EAGLE Task

9  Force and more than twelve years with the Bureau of Drug Law

10  Enforcement, can you indicate to Judge Cohill what you

11  typically observe in the course of street level of a house

12  level drug deal?

13  A   Generally, the individual that would make the purchase

14  from a residence like that would be released from our

15  custody.  They would proceed to the residence.  Usually, it's

16  a very short, brief period of time, a couple minutes, and

17  then would come back out and then we would again meet with

18  them and take possession of the drugs.

19  Q    And when you are conducting these types of

20  investigations, outside of the controlled purchase setting,

21  are you mindful of that type of activity, the brief presence

22  and approach to a particular house known for the sale of

23  crack cocaine and the exiting or leaving of that residence?

24  A    Yes, sir.

25  Q    At any point in time up to March 2nd, 2005, are you

7

1  familiar today with whether any garbage pulls, any steps were

2  taken to obtain garbage left at curb side from any of the

3  vicinities that you were conducting investigative activity on

4  March 2nd?

5  A    Yes, sir.  Specifically related to the East 14th Street

6  location.

7  Q    Okay.  And from the garbage pull from the East 14th

8  Street location, what led you to increase your suspicions of

9   the activity in that vicinity as a result of the garbage

10   pull?

11   A   There was a trash pull conducted by, I believe it was

12   Corporal Toski in January of 2005 which produced numerous

13   clear, plastic baggies and a few that -- a couple of the

14   plastic baggies field tested positive for the presence of

15   cocaine.

16   Q   If I can draw your attention again to March 2nd, 2005.

17         On March 2nd, 2005, what observations were you

18   making consistent with or as part of your drug investigation

19   in that location?

20   A   I was notified that there was a vehicle parked in front

21   of 448 East 14th Street, and there was a white female.  The

22   car was running.  It was parked in front of the address.

23   Q   And were other members of the EAGLE Task Force involved

24   in the investigative activity in that vicinity?

25   A   Yes, sir.  Corporal Robert Toski, T-o-s-k-i, and Trooper

8

1   Richard Houk, H-o-u-k.

2   Q   Now, what observations were made once you arrived in the

3   area with regard to that Cadillac?

4  A   I was asked -- Corporal Toski and Trooper Houk were in

5  the same vehicle and they had asked me to go by -- they had

6  trouble reading the registration plate and they had asked me

7  to go by and confirm -- they had ran the plate two different

8  ways and they wanted me to confirm the plate number.

9       So, I drove past and I saw the white Cadillac

10  situated on East 14th Street, confirmed the registration

11  plate and, um, then the vehicle started to move later.

12  Q   Now, did you learn from Corporal Toski or Trooper Houk

13  why it was that they were sending you over to confirm the

14  registration plate that they apparently already checked

15  through the computer system?

16  A   Yes, sir.  There was snow on the registration plate

17  which prevented a complete view of the registration plate.

18  Q   And have you discovered whether they had actually run

19  the first letter in that registration plate in one fashion

20  prior to running it in the proper fashion according to what

21  was actually on the plate itself?

22  A   Yes, sir.

23  Q   And the first time that the registration plate or the

24  license plate was run, did the information come back not

25   match in any way the vehicle causing Corporal Toski and

9

1   Trooper Houk to be concerned that it wasn't the right number?

2   A   Yes, sir.  From my understanding, sir, it came back to a

3   vehicle other than the Cadillac, which made us believe it was

4   not the right registration plate.

5   Q   And you were running it a different way, and I believe

6   it's the difference between running it as an E or an F?  Is

7   that your understanding of the letters?

8   A   Yes, sir.

9   Q   Did it then the second time come back to a Cadillac?

10   A   Yes.

11   Q   Were they still concerned enough about the registration

12   plate because it had been obscured that they sent you to

13   actually get a closer look to confirm whether or not it was

14   the right plate number?

15   A   That's correct.

16   Q   Did you also observe that the plate was partially

17   obscured by snow?

18   A   Yes, I did, sir.

19   Q   But, now since you are in tune to what you are

20  specifically looking for, were you able to identify the plate

21  itself?

22  A   Yes.

23  Q   But, nonetheless, as a Pennsylvania State Trooper, were

24  you at least in tune to the fact that, in violation of

25  Pennsylvania law, the registration plate had been partially

10

1  obscured?

2  A   Yes, sir.

3  Q   Now, after you made that check, you said the car began

4  to move?

5  A   I was notified by Corporal Toski and Trooper Houk that

6  two black males had come out of 448 East 14th Street and

7  entered the Cadillac and the Cadillac was departing.

8  Q   And you were going to be the person in the proximity to

9  be able to follow that vehicle after these individuals left

10  the 14th Street address and got into that vehicle?

11  A   Yes.

12      THE COURT:  I am not sure I understand.  There are

13  two different police cars involved.  I mean, when I say

14  police cars, cars containing policemen?

15      THE WITNESS:  That's correct, sir.  There was my

16  car -- they were both undercover vehicles.

17      THE COURT:  Both unmarked?

18      THE WITNESS:  Well, undercover, not just unmarked,

19  like a Ford Crown Victoria without a red and blue light.

20  Mine was a 1995 Oldsmobile Achieva, and I am not sure what

21  car Corporal Toski and Trooper Houk were in, but it's

22  unmarked, like a pickup truck, or something like that, sir.

23  BY MR. PICCININI:

24  Q    So, Trooper Houk and Corporal Toski were in the same

25  vehicle, you were by yourself in your Olds Achieva?

11

1  A   That's correct?

2  Q   Can you describe for Judge Cohill the weather conditions

3  on that day as you recall it?

4  A   Cold and snow.

5  Q   And the obscuring of the license plate, what was it

6  obscured with?

7  A   It was obscured with snow.

8  Q   Now, after Corporal Toski had related to you that these

9   two males came out of the 448 East 14th Street address and

10  entered into the Cadillac, what did you do?

11  A    We -- both vehicles attempted to conduct surveillance,

12  mobile surveillance on the vehicle, on the Cadillac.

13  Q    Did that mean you followed the vehicle?

14  A    That is correct.

15  Q    And what did you observe it do?

16  A    Um, at two different locations, I observed, at one

17  point, the driver of the Cadillac eastbound on Buffalo Road

18  at East Avenue proceeded into the intersection before

19  stopping and then proceeded to go on to -- continuing

20  eastbound.

21       And at eastbound on Buffalo Road at Downing Avenue,

22  the operator signalled to make a southbound turn onto

23  Downing, actually began to turn the car onto Downing and then

24  swerved the car back onto Buffalo Road and proceeded to

25  June Street.

12

1   Q    And in your description of this event, your

2   observations, did you provide for me a rough diagram that

3  might help you explain to Judge Cohill what your observations

4  were?

5  A    Yes, sir.

6        MR. PICCININI:  And, Judge, if I can have the

7  witness come down from the witness stand and use the document

8  cam, you can be able to view what he said.  You can come on

9  down here.

10  (The witness left the stand.)

11  Q    Now, in this diagram, which I have marked as Government

12  Exhibit 1 --

13        MR. PICCININI:  Judge, if I can just wait until

14  your --

15        THE COURT:  Yes.  Just wait until --

16        THE CLERK:  It's showing up pink.

17        MR. PICCININI:  Yes.  It is showing up pink here

18  also.

19        THE CLERK:  Maybe there is something I can do here.

20  (Off the record discussion.)

21        THE COURT:  That's all right.

22        MR. PICCININI:  Okay.  Is that good enough, Judge?

23        THE COURT:  Go ahead.

24  BY MR. PICCININI:

25   Q    Trooper, on this diagram at the bottom -- marked as

13

1   Government Exhibit 1 for identification at the bottom, there

2   is a line that goes through here.

3        Does that represent the line of Buffalo Road

4   itself?

5   A    Yes, sir.

6   Q    And can you indicate with your pen for Judge Cohill the

7   direction in which the vehicle traveled as you were following

8   it?

9   A    Eastbound.

10   Q    Okay.  And when it got in the vicinity of the

11   intersection of Buffalo Road and East Avenue, which is

12   reflected with a circle and the word is in the middle of this

13   diagram, can you explain or show to Judge Cohill in some

14   fashion the nature of the traffic violation that you observed

15   there?

16   A    Yes, sir.  Right here, there is an intersection.  And

17   the Cadillac, before stopping -- whoops, it's blacking out --

18   before stopping, just rolled right into the intersection.

19  Q   At the point in time that it rolled into the

20  intersection, what was your concern was going to happen here?

21  A    My first instinct was that maybe they observed my

22  vehicle and they thought that I was following, which I was

23  following them, but that I thought maybe that they were onto

24  surveillance and that they just -- that they might just blow

25  by an intersection.


                              14


1          THE COURT:  This is controlled by a traffic light?

2          THE WITNESS:  Yes, sir.

3  BY MR. PICCININI:

4  Q    And did they proceed into the intersection?

5  A    Yes, sir.

6  Q    And was the light, at the time, red?

7  A    Yes, sir.

8  Q    And then after proceeding into the intersection, did it

9  eventually stop after getting into the intersection?

10  A    Yes.

11  Q    And then did it proceed?

12  A    Yes.

13  Q    Can you indicate to the Judge what direction the vehicle

14  traveled from there?

15  A    Yes, sir.  It proceeded eastbound.  And then upon

16  reaching Downing, they had signalled to turn south onto

17  Downing and actually physically did pull the car onto Downing

18  and then swerved right back onto Buffalo Road and then

19  proceeded up to June Street.

20  Q    So, if I can utilize your pen, here in the top section

21  of this rough diagram, the vehicle continued to proceed onto

22  Buffalo Road, signaled to turn onto Downing, did so in some

23  respect, and then swerved back onto Buffalo?

24  A    That is correct.

25  Q    Okay.  You can take your seat?

15

1  (The witness returned to the witness stand.)

2  Q    Now, Trooper Wagner, after having observed those three

3  events, the license plate and the two traffic violations, did

4  you then continue to follow the vehicle?

5  A    Yes, sir.  We followed it up to the area of June Street.

6  Q    And can you indicate to Judge Cohill what your

7  observations were in the vicinity of June Street?

8  A   Yes.  Corporal Toski and Trooper Houk indicated the

9  vehicle had pulled over on June Street, in the vicinity of

10  2125 June Street on -- I think on the west side of the

11  street.

12  Q    And is that a location specifically where a previous

13  controlled purchase of crack cocaine occurred?

14  A    That is correct.

15  Q    And what were the observations there at June Street?

16  A    The observations -- Corporal Toski observed,

17  approximately a minute after the vehicle had stopped in the

18  vicinity of 2125 June Street, observed the black male that

19  had been in the front of the vehicle come out of the 2125

20  June Street address and get back into the Cadillac.

21  Q    And that is in the front passenger's seat of the

22  vehicle?

23  A    That's correct.

24  Q    And the driver of the vehicle was a woman, is that

25  correct?

16

1  A    That's correct.

2  Q    And then the two black males that had gotten out of the

file:///A|/FLEET-1.TXT

3   house at East 14th Street had gotten into the vehicle?

4   A    That's correct.

5   Q    At that point in time, what steps did you take?

6   A    The vehicle departed and we continued with surveillance.

7        And we -- based upon everything that had gone on,

8   we arranged to contact the Erie Police Department and ask for

9   a traffic stop to be conducted.

10  Q    Okay.  Now, you had indicated to Judge Cohill that both

11  of the EAGLE Task Force vehicles were not only unmarked but

12  also undercover.

13       In your experience with the Pennsylvania State

14  Police, is it a wise step to attempt to conduct a traffic

15  stop in what in this case would have been your 1995 Olds

16  Achieva?

17  A    It is preferred, if at all possible, to obtain a marked

18  unit to make the traffic stop.

19  Q    And that is a regular course, as you are conducting

20  these investigations, that a stop needs to be conducted, you

21  don't conduct it in your undercover vehicle, you seek local

22  law enforcement assistance to do the traffic stoop?

23  A    Yes, sir.

24  Q    And in this particular case, were steps taken to contact

25  the Erie Police Department to assist in conducting the

17

1  traffic stop?

2  A    Yes, sir.

3  Q    And after that information was radioed to the Erie

4  Police Department, were you in the proximity when the traffic

5  stop occurred?

6  A    Yes, I was.

7  Q    Explain to Judge Cohill what happened.

8  A    The traffic stop was made in the vicinity of East 26th

9  Street and Wallace.  And for a moment, I just stayed back,

10  and then I approached and spoke with personnel from the Erie

11  Police Department and discussed the matter with them.

12  Q    But, you were actually in sight of the traffic stop

13  itself, although you didn't get in the middle of it because

14  it was marked officers conducting the stop?

15  A    That is correct.

16  Q    Now, after the traffic stop occurred and you approached,

17  were you present or in that proximity when an attempt was

18  made to identify the front seat passenger of the vehicle?

19  A    Yes.  I learned that the passenger had no identification

20  and had given the name Michael Johnson.

21  Q    But provided no identification to verify that?

22  A    That's correct.

23  Q    Was the passenger asked to exit the vehicle?

24  A    That is correct.

25  Q    And what officer was in the proximity of the person

18

1  identifying himself as Mr. Johnson when he stepped out of the

2  vehicle?

3  A    Officer Fuhrman had asked him -- it was Officer Fuhrman,

4  I believe, was the one that asked him to get out.

5  Q    And did any of the officers indicate in any way that

6  they had observed something when mister, at the time,

7  Johnson, stepped from the vehicle?

8  A    Yes.  As Mr. Johnson, at the time, had stepped out of

9  the vehicle and was moving towards the rear, I believe it was

10  Officer Smith from the Erie Police Department said wait, or

11  something to that effect.  He had seen something fall from

12  the coat of the subject.

13  Q   And then Officer Smith, who will be here to testify

14  today, is he the one that took steps to retrieve the item and

15  then proceed further at that time?

16  A   Yes.

17  Q   Now, first of all, with regard to the drug investigative

18  activity, did you and the other law enforcement officers

19  believe that you possessed enough reasonable suspicion

20  concerning the drug activity by itself to have conducted a

21  traffic stop?

22  A   Yes, sir.

23  Q   And then in addition the traffic violations themselves

24  from your testimony here today, did you feel satisfied that

25  you had probable cause that there had been three clear

                    Wagner - Cross              19


1   violations of the Pennsylvania Vehicle Code?

2   A   Yes, sir.

3        MR. PICCININI:  Judge, those are all my questions,

4   and I request the admission of Government Exhibit 1.

5        THE COURT:  That is the map?

6        MR. PICCININI:  Yes, it is.

7        THE COURT:  One is admitted.

8      Mr. Patton.

9            CROSS-EXAMINATION

10  BY MR. PATTON:

11  Q    Trooper Wagner, on the evening of March 2nd of 2005, you

12  were conducting surveillance on the house at 448 East 14th

13  Street here in Erie, correct?

14  A    Yes.

15  Q    And as you were doing that, you were also being assisted

16  by two other EAGLE Task Force members, correct?

17  A    That's correct.

18  Q    And on that night, you were just doing general

19  observations to see what information you could discover, is

20  that correct?

21  A    Yes.  Um, we have several investigations that we have,

22  that we undertake at maybe one time and part of our routine

23  is to check various addresses, locations associated with the

24  subjects that we are investigating.

25            And was actually -- and it was actually Corporal


                Wagner - Cross                20


1  Toski and Trooper Houk that had notified me that there was a

2   Cadillac parked in front of this address and that's how, that

3   evening, I became involved.

4   Q    But, on that address, you guys didn't have -- or on that

5   evening, you had no specific address that any drug activity

6   was going to occur that evening at the East 14th Street

7   address, correct?

8   A    That's correct.

9   Q    This was just general surveillance on a house you guys

10  believed may be involved in drug distribution?

11  A    Can you repeat that again?

12  Q    You did not have any specific information that on the

13  evening of March 2nd, 2005, drug activity was going to be

14  occurring at 448 East 14th Street, correct?

15  A    That's correct.

16  Q    Now, as you were doing your part of the surveillance

17  before you get the call about the white Cadillac, where

18  physically are you located?

19  A    Um, I'm not certain, sir.

20  Q    Were you in your car?

21  A    I don't know if I was in my car or if I was in the Task

22  Force office.  I can't -- I just don't know.

23  Q    Where is the Task Force office?

24        MR. PICCININI:  Your Honor, the specific location

25   of the Task Force office is something that I think, from a


                    Wagner - Cross            21


1   law enforcement standpoint, should not be disclosed.  He can

2   give a general perimeter of the location.

3         THE COURT:  How far away were you from the house,

4   let's say?

5         THE WITNESS:  Yes, sir.  If -- it was five to eight

6   blocks away maybe if I was in the office.  I just can't

7   remember exactly where I was at, sir.

8   BY MR. PATTON:

9   Q    Where physically were Toski and Houk located when they

10   called you to check out the Cadillac?

11   A    They were in the neighborhood somewhere.  I am not sure

12   of exactly where their position was at, but they were

13   obviously in the neighborhood of East 14th Street.

14   Q    Well, where, in relation to the white Cadillac, was

15   Toski and Houk's car?

16   A    I don't know.  I don't know the answer to that.

17   Q    Okay.  So, you don't know where Houk and Toski are

18  physically located, but you get a call from them saying they

19  want you to come to 448 East 14th Street?

20  A   That's correct.

21  Q   When you got to 448 -- or the area of 448 East 14th

22  Street, did you see Houk and Toski's vehicle?

23  A   Um, I don't believe I did.

24  Q   Did you see the Cadillac?

25  A   Yes.


                    Wagner - Cross              22


1  Q    And so you were able to see the Cadillac, but you did

2  not see Houk and Toski's vehicle?

3  A   At this time, sir, I don't recall whether I saw their

4  vehicle or not.  I mean, they -- the idea is to kind of try

5  to blend in with what's going on.  You don't want to stick

6  out.

7        So, it is not uncommon, if we are conducting

8  surveillance, sometimes you might say, you might tell another

9  surveillance member I am situated to the east or I'm, you

10  know, to the west, or I am on this street.  That's quite

11  common.

12        It's also -- they may have told me where they were

13  situated.  I know they were situated in a place where they

14  were able to see the subjects coming out of the house.

15       But, for purposes of accuracy, I just don't recall

16  exactly.  I hate to tell you something and be wrong about it.

17  I don't recall their exact location.

18  Q   I understand when you are doing surveillance you want to

19  try and blend in, but you know who Toski and Houk are,

20  correct?

21  A   That's correct.

22  Q   You know the undercover vehicle they use, correct?

23  A   That's correct.

24  Q   So, even if they were blending into the general public,

25  if you see their vehicle, you are going to know that it is

                    Wagner - Cross          23

1  them sitting there, correct?

2  A   Well, sir, if they were a street --

3  Q   If you see Toski and Houk sitting in their unmarked

4  vehicle, you know it is Toski and Houk in their unmarked

5  vehicle, correct?

6  A   Yes.

7  Q    But, you don't have a memory of where Toski and Houk

8  were when you went to 448 East 14th Street on the evening of

9  March 2nd, 2005?

10  A    Yes, sir, that's correct.

11  Q    And you have no idea where they were located before you

12  got to 448 East 14th Street?

13  A    That's correct.

14  Q    So, you have no idea where they were when they

15  supposedly tried to run this license plate, correct?

16  A    I assume.

17  Q    Yes or no?

18  A    No.

19  Q    You came by on East 14th Street in response to Toski and

20  Houk's call, correct?

21  A    That's correct.

22  Q    Expecting to see a white Cadillac sitting in front of

23  448 East 14th Street, correct?

24  A    That's correct.

25  Q    You drove past that Cadillac, correct?

Wagner - Cross                 24

1  A    That's correct.

2  Q   And as you were driving by the Cadillac, you confirmed

3  that the license plate on the Cadillac was FJB-7514, correct?

4  A   That's correct.

5  Q   And you were able to do that as you drove by at

6  approximately ten o'clock at night, is that right?

7  A   That's correct.

8  Q   You didn't have to go past twice, did you?

9  A   No, I did not.

10  Q   You didn't stop, correct?

11  A   I did not stop, no.

12  Q   You didn't want the person in the white Cadillac to know

13  you were a police officer, correct?

14  A   That's correct.

15  Q   You wanted to remain anonymous, is that right?

16  A   Yes.

17  Q   Just appear to be just a car that is driving past,

18  right?

19  A   Sure.

20  Q   And as you were doing that, when you came -- got behind

21  the Cadillac, you were able to confirm the license plate as

22  you were driving by as the FJB-7514?

23  A  I did.

24  Q  And you knew, or at least Houk and Toski knew, that

25  FJB-7154 was registered or came back to being registered to a

Wagner - Cross                25

1  white Cadillac, right?

2  A  The FJB-7514, yes.

3  Q  And as you drove past that vehicle, you were able to --

4  it's dark out, is that correct?

5  A  Yes.

6  Q  It's roughly ten o'clock at night?

7  A  Yes, I believe that's correct, sir.

8  Q  And there is a not a street light right in front of

9  448 East 14th Street, is there?

10  A  I am not certain.

11  Q  It's in the middle of the block right between -- like,

12  between -- I believe it's German and Parade?

13  A  No.  It's not -- German and Parade is the 300 block,

14  isn't it?

15  Q  Parade and -- German and Highland, is that right?

16  A  No.  That is the 200 block, isn't it, sir?  I think the

17  400 block is Parade and Wallace, isn't it?

18  Q    It would be east of Parade Street, correct?

19  A    That is correct.  And I don't know where the street

20  lights are.

21  Q    Did the white Cadillac have its lights on as you drove

22  past?

23  A    At this time, sir, I don't recall.

24  Q    But, even if the lights were off, you were able to see

25  the license plate as you drove by?

                    Wagner - Cross              26

1  A    Yes.

2  Q    Now, when you went out to assist on this investigation,

3  knowing you were going to be engaged in some surveillance,

4  did you take any -- take a notepad and a pen with you?

5  A    Um, did I take -- I don't specifically -- sometimes I

6  have notepads in my car or pieces of paper.

7  Q    Did you take notes to -- while you were doing the

8  investigation, while you were sitting there waiting for the

9  car to take off, documenting the time that things were

10  happening?

11  A    Um, I don't recall.  I don't recall that.

12  Q   You may have taken notes, or you just don't know?

13  A   I don't know.

14  Q   So, you may have, you may not have?

15  A   That's correct, sir.

16  Q   Now, you said that after the -- well, I'm sorry.  Let me

17  back up.

18      The residence at 448 East 14th Street --

19  A   Yes, sir.

20  Q   -- is that an apartment complex, a house, or what?

21  A   I believe there are several different units in that.

22  Q   There are several units inside that building?

23  A   Building.

24  Q   Now, is it fair to say that the building appears to be

25  what at one time was probably just a single-family residence

Wagner - Cross              27

1  that has now been divided into apartments?

2  A   Yes, that seems fair.

3  Q   And so there is multiple apartments at 448 East 14th

4  Street, is that right?

5  A   Yes.

6  Q   And to get into the apartments, to reach the doors that

7   led directly into the apartments, you have to go through a

8   common door, correct?

9   A   Yes.

10  Q   The information that you had from your CI about drugs

11  being dealt out of 448 East 14th Street, what unit did it say

12  was being used?

13  A   I don't -- I don't know if the information was

14  specifically pertaining to a unit.

15  Q   You guys didn't know what unit that was supposedly being

16  utilized by these people from Cleveland?

17  A   Correct.

18  Q   And the trash pull that you conducted at that location,

19  there was just one?

20  A   There may have been a couple.  Right now, one comes to

21  mind, sir.

22  Q   And that was in January of '05, is that correct?

23  A   That's correct.

24  Q   Do you recall when in January?

25  A   Not the exact date.  I can --

Wagner - Cross                28

1  Q   Now, when you say a trash pull, I assume you went there,

2  on whatever night it is for that area of the city that their

3  trash night is, to try and go through the trash that's set

4  out front of 448 East 14th Street, is that correct?

5  A   Yes, sir; to move the trash, yes.

6  Q   You didn't know which unit the trash you were reviewing

7  came from, correct?

8  A   I think that is correct.  It was placed -- from my

9  understanding on the one in January, I don't believe I was

10  part of that.

11       It was my understanding it was placed directly in

12  front of 448 East 14th Street, but I am not aware of

13  information that indicated what specific unit inside that

14  building it was from.

15  Q   You dictated a report in this case, is that correct?

16  A   Yes, sir.

17  Q   What would commonly be referred to as an FBI 302?

18  A   That's correct, sir.

19  Q   When you dictated that report, did you refer to any

20  notes that you had taken?

21  A   Um, I may have.  Could I look at it and --

22  Q   Look at the report?

23  A   Yeah.

24  Q   Sure.

25  A   I don't see anything on there, sir, about notes.

Wagner - Cross                    29

1  Q   If you had used notes to assist you in writing this,

2  would you have documented that in the report?

3  A   Not necessarily.

4  Q   And is it fair to say -- well then, you don't know if

5  you used any handwritten notes to assist you in dictating

6  this report, is that your testimony?

7  A   Um, no, because -- I think I did -- can I look at my

8  copy for a second?

9  Q   Of the report?

10  A   Yeah.  I actually --

11  Q   Is it somehow different than the thing I have?

12  A   No.  No.  That's why I brought it up.  Because I

13  remember taking, like, written notes when Adrianna Havelka

14  was interviewed.

15       So, I remember writing notes down and I think I had

16  written some notes down when talking to the other two

17  subjects.  I don't know where those notes are at.  They may

18  have been in the 1-A file I think they call it and I maybe

19  did not specify in this report.

20      MR. PATTON:  Your Honor, I would ask for -- that

21  the trooper be required to produce those notes for your

22  review.

23      Under Third Circuit law, the trooper has a duty to

24  preserve those rough notes so that, upon the defense request,

25  you can review them to see if they are consistent with the


                Wagner - Cross              30


1  prepared report and then to see if there is any Brady

2  material or exculpatory material in those reports.

3      MR. PICCININI:  Your Honor, I don't disagree with

4  his proposition of law.  The witness isn't even certain he

5  took notes.  He certainly hasn't brought any notes with him

6  here today.

7      THE COURT:  We'll ask him to deliver them to -- I

8  have to go back to Pittsburgh tomorrow.  So, if you can

9  deliver them to Mr. Piccinini before or -- and also to

10  Mr. Patton before I leave tomorrow, that is fine.  Otherwise,

11  deliver them to both of them and they can forward them to me

12  in Pittsburgh.

13      MR. PICCININI:  Your Honor, my only concern with

14  that is, Mr. Patton is only entitled to the notes if the

15  Court were to find in camera that there is a discrepancy upon

16  which the witness can be examined.

17      THE COURT:  I think he is entitled to the notes if

18  they were here in the courtroom.

19      MR. PICCININI:  I guess if he had them up here.

20      THE COURT:  So, there is no difference between that

21  and producing them afterwards.  Tell -- trooper, deliver the

22  notes to Mr. Piccinini and Mr. Patton if they exist, and then

23  they will see that I get them and I won't make any decision

24  on this until I have reviewed them.

25      MR. PICCININI:  Judge, if I may, even though the

                    Wagner - Cross            31

1  witness is called, I can have the trooper attempt to --

2      THE COURT:  If it can be done today, all right.

3      THE WITNESS:  Yes.

4      THE COURT:  Okay.

5  BY MR. PATTON:

6  Q    Now, you had said on the evening of March 2nd, 2005, the

7  weather was cold and snowy, correct?

8  A    Yes, sir.

9  Q    That was, I guess, the basis of the license plate

10  supposedly being partially obscured, right, is that it's

11  covered by snow?

12  A    Yes.

13  Q    And you testified that you drove past the white Cadillac

14  that night as it was parked out front of 448 East 14th

15  Street, correct?

16  A    Yes.

17  Q    And you saw the Cadillac covered with snow?

18  A    I don't know if the whole Cadillac was covered with

19  snow.  I don't recall the whole Cadillac being covered with

20  snow.

21  Q    Well, was there any snow on the vehicle?

22  A    Um, I don't think -- I mean, obviously in the license

23  plate area, but I don't think that the rest of the car was

24  covered.  It may have been around the bumpers, and stuff like

25  that, but I don't think all the cars were riding around with

Wagner - Cross            32

1  snow on them.

2  Q    So, the car doesn't have snow, for example, on the hood

3  of the car?

4  A    No, I don't believe it did.

5  Q    Doesn't have snow on the roof of the car?

6  A    I don't believe so.

7  Q    Doesn't have snow on the trunk of the car?

8  A    I don't believe it did.

9  Q    But, it has snow on the license plate?

10  A    Yes.

11  Q    Now, after you did the traffic stop and the arrest, and

12  everything, on the evening of March 2nd of 2005, the

13  following day you wrote up an affidavit in support of a

14  criminal complaint charging Mr. Fleetwood with the federal

15  crimes that we are here on today, is that correct?

16  A    Yes, sir, there was an affidavit prepared.

17  Q    By you?

18  A    The -- well, the affidavit was generated from the

19  U.S. Attorney's Office with the information -- I mean, I

20  didn't physically sit down and type it.

21  Q    Who did?

22   A   I believe personnel at the U.S. Attorney's Office.  I am

23   not sure exactly which personnel.

24   Q   Were any of those personnel present on the evening of

25   March 2nd, 2005?

Wagner - Cross                 33

1   A   No, sir.

2   Q   How did they get the information that was put into the

3   report?

4   A   The information was provided to them.

5   Q   By whom?

6   A   By myself.

7   Q   How?

8   A   I believe telephone, and I think I had gone over the

9   office.

10   Q   And you were the one that physically signed that

11   affidavit, correct?

12   A   That's correct, sir.

13   Q   Which is a sworn document, correct?

14   A   That's correct, sir.

15   Q   And I assume you wanted to make sure that you were

16   swearing to an accurate affidavit, is that correct?

17  A   You do want, to -- yes, sir, you do.

18  Q   So, you read the affidavit before you signed it?

19  A   I did read the affidavit, yes.

20  Q   To make sure that the information that was in there was

21  accurate as you had given it to the personnel at the

22  U.S. Attorney's Office?

23  A   Yes, sir.

24  Q   And you read the affidavit and signed it, correct?

25  A   That is correct, sir.

                    Wagner - Cross            34


1   Q   Because you believed the information that was in that

2   affidavit was accurate?

3   A   Yes, sir.

4   Q   And, in fact, you were swearing under oath that all the

5   information contained in that affidavit was true and correct?

6   A   Yes, sir.

7   Q   And you didn't have any confusion over that, correct?

8   A   At the time, no, sir.

9   Q   Well, do you have confusion now as to whether or not the

10   information in your affidavit was correct?

11  A    Yes, sir.  There is one area that I would like to

12  correct on that.

13  Q    Because it is not matching up with your testimony today,

14  isn't that right?  That's why you want to correct it?

15  A    What's that?

16  Q    You want to correct something in the affidavit because

17  you now know it is not consistent with what you testified to

18  today, don't you?

19  A    Well, there is one area -- yes.

20  Q    Do you want to take a look at Defendant's Exhibit B?

21  A    Yes, sir.

22  Q    Is that the affidavit, or excuse me, the criminal

23  complaint and the affidavit that you swore out in support of

24  the criminal complaint that was filed in this case?

25  A    Yes, sir.


                    Wagner - Cross                    35


1            THE COURT:  I have a copy of it in front of me.

2            MR. PATTON:  Okay.

3   Q    In paragraph seven of your affidavit that you signed out

4   and that you swore was accurate, does it say that:

5            In addition while traveling west on East 26th

6    Street, I observed the driver of the white Cadillac commit

7    several other traffic violations?

8          Does it say that?

9    A    Yes, sir.

10    Q    And do you recall the detention hearing that was held in

11    this case?  Do you remember that?

12    A    Yes.

13    Q    And you testified at that?

14    A    Yes.

15    Q    On March 8th of 2005?

16    A    Yes.

17    Q    And at that time, you identified the other traffic

18    violations as being, going part way into an intersection

19    before stopping at a red light and making a turn and then not

20    following through on the turn, is that correct?

21    A    That's correct.

22    Q    And at that time, you did not testify that those

23    violations occurred while the vehicle was traveling east on

24    Buffalo -- or, yes -- on East Buffalo Road, correct?

25    A    That's correct.

Wagner - Cross              36

1  Q    Now, the report that you wrote the, the FBI 302, on the

2  front page of that at the bottom it indicates that the date

3  the report was dictated was 3-8-05.  Is that accurate?

4  A    Yes.

5  Q    So, that would have been the date of the detention

6  hearing, correct?

7  A    Yes.

8  Q    And you, in fact, dictated this report after you

9  testified at the detention hearing, didn't you?

10  A    Um, I am not sure in time, before or after.  I don't

11  know.

12  Q    Well, Trooper Wagner, you knew you were going to be

13  testifying at the detention hearing, correct?

14  A    Yes.

15  Q    And you knew that if you testified at the detention

16  hearing, and if you had written a report at the time you

17  testified at the detention hearing, that report would have to

18  have been turned over at the detention hearing, correct?

19  A    I don't know.

20  Q    And this report wasn't turned over at the time of the

21  detention hearing, was it?

22  A   I don't know.  I don't know if it was or wasn't.

23  Q   Well, in fact, the report says that it wasn't

24  transcribed until April 6th of 2005, is that right?

25  A   Okay.  Then it probably wasn't, sir.


                    Wagner - Cross                37


1   Q   But, you don't remember if you dictated it after you

2   testified at the detention hearing because -- there is no

3   question -- let me do this:

4          There is no question it was dictated sometime on

5   March 8th, 2005, correct?

6   A   Okay.  Correct.

7   Q   And the detention hearing was on March 8, 2005, at two

8   p.m. and concluded at 3:10 p.m.?

9   A   Okay.

10  Q   And you don't know if you dictated the report before or

11  after the detention hearing?

12  A   It's possible I could have been even working on it prior

13  to and subsequent to.  I don't know.

14  Q   At the detention hearing, you were asked questions by

15  myself about the stop in this case, correct?

16  A   Yes.

17  Q   And about the basis for that stop, correct?

18  A   That's correct.

19  Q   And at no time, when you testified at the detention

20  hearing, did you ever say that one of the bases for the stop

21  was that you believed you had reasonable suspicion to suspect

22  that Mr. Fleetwood had been involved in a drug transaction,

23  did you?

24  A   No.

25  Q   When you were asked at the detention hearing about what

                    Wagner - Cross                    38

1  the basis for your stop was, you testified that the basis for

2  the stop was for alleged traffic violations, correct?

3  A   Yes.

4  Q   And in your affidavit in support of the criminal

5  complaint, you stated that the basis for the stop was

6  violation of the Pennsylvania Motor Vehicle Code,

7  specifically 75 P.A.C.S.A. Section 1332, a motor vehicle

8  displaying a partially obscured registration plate, correct?

9  A   Correct.

10  Q   Nowhere in the affidavit in support of your criminal

11   complaint did you ever say that the basis for your stop was

12   that you had reasonable suspicion to believe that

13   Mr. Fleetwood had engaged in drug activity and, therefore,

14   you were investigating the drug activity?

15        You never said that --

16   A   Okay.

17   Q   -- correct?

18   A   Yes.

19   Q   And, indeed, when I asked you about the basis of the

20   traffic stop at the detention hearing, you testified that you

21   talked over the radio with Houk and yourself and you guys

22   decided that you had the basis for a traffic violation and

23   that's why you called the Erie Police Department to do the

24   stop, correct?

25   A   I believe so, yes.

                    Wagner - Cross                39

1   Q   And, in fact, that's why the stop was made, because you

2   guys decided, hey, we think we got traffic violations here so

3   let's do a stop on the traffic violations and see what we can

4   develop?

5   A    Sir, I think it's the totality of the circumstances,

6   yes.  I mean, the traffic violations were the basis for the

7   traffic stop.  But, we were also conducting a drug

8   investigation.

9   Q    Well, you didn't testify at the detention hearing that

10  you and Houk talked over the radio and decided that, based on

11  your drug investigation, you had grounds to stop to

12  investigate the drug activity, did you?

13  A    No.

14  Q    Your testimony was, you talked with Houk, you guys

15  decided we got enough for a traffic stop so let's do the

16  traffic stop, correct?

17  A    Repeat that, please?

18  Q    When you testified at the detention hearing, you

19  testified that the basis for the stop was you and Houk

20  talking back and forth and deciding you guys had a basis for

21  the stop because of traffic violations?

22  A    Correct.

23  Q    And that was, in fact, the basis for your stop?

24  A    Well, yes.

25  Q    Now, you weren't really that concerned about the traffic

1  violations, your main focus was the drug investigation,

2  correct?

3  A   Yes.

4  Q   But, you guys decided we have enough to do a traffic

5  stop so that let's stop him, then we can see what will

6  develop from the stop, correct, which is a common, you know,

7  investigative manner that you guys are taught when you are

8  trained to do drug investigations, correct?

9  A   Um, I don't know if we are taught that, but we wanted to

10  make sure that we had a reason to stop the vehicle and that

11  we -- that there were three traffic violations and we stopped

12  the vehicle.  We had the vehicle stopped.

13  Q   Now, when you did your mobile surveillance on the

14  Cadillac as it was driving -- let's focus first from 448

15  East 14th Street to the June Street address.

16  A   Yes.

17  Q   You guys had two vehicles involved in that?

18  A   Yes.

19  Q   And you guys were trying to prevent the people in the

20  white Cadillac from figuring out that they were being

21  followed, correct?

22  A   Yes.

23  Q   To do that, you tried to keep some distance between

24  yourself and the white Cadillac, correct?

25  A   At times.  At times, it's impossible to do that.  But,

                    Wagner - Cross              41

1  as a general rule, yeah.

2  Q   And sometimes you would switch off between you following

3  the white Cadillac and then Toski and Houk switching off and

4  getting their vehicle behind the white Cadillac?

5  A   In this case -- that does happen.  In this case, I am

6  not sure if that happened.

7  Q   As the Cadillac was traveling east on Buffalo Road, was

8  there ever a time where there were vehicles between your

9  vehicle and the white Cadillac?

10  A   I don't recall, sir.

11  Q   Was there a vehicle between your vehicle and the white

12  Cadillac as you approached East Street, or East Avenue?

13  Excuse me.

14  A   I don't believe so, sir.

15  Q   But, you don't know for sure?

file:///A|/FLEET-1.TXT

16  A  I am not a hundred percent certain, but I don't believe

17  there was.

18  Q  And how far behind the white Cadillac were you at that

19  time?

20  A  Um, at one point, maybe forty, fifty feet.

21  Q  Then after they went through the intersection at East

22  Avenue, you continued to follow them?

23  A  Yes, sir.

24  Q  At Downing Street you were still behind the white

25  Cadillac?

                    Wagner - Cross              42

1  A  Yes, sir.

2  Q  Were there any vehicles between your vehicle and the

3  white Cadillac as the white Cadillac reached Downing Street?

4  A  I don't recall.

5  Q  When the white Cadillac signalled what would have been a

6  right turn --

7  A  Correct.

8  Q  -- to go south on Downing, were there any other vehicles

9  on Downing Street at that intersection?

10  A    On Downing Street?  Um, I don't think -- I don't know

11  about if there was any on the north side.  I don't think

12  there were any on the south side on Downing Street.

13  Q    Okay.  So, you don't -- you are pretty confident there

14  wasn't any car in the southbound lane of Downing, but you

15  don't know if there was on the north?

16  A    Yeah.  I am not sure about the north side.  I don't

17  think there were any on the south side, but I am not certain.

18  Q    And there is not a stop light at the intersection of

19  Buffalo Road and Downing, is that correct?

20  A    I think there is.  I think.

21  Q    When you saw the Cadillac supposedly start the

22  right-hand turn and then come back onto East Avenue, was

23  there any car between your car and the white Cadillac at that

24  time?

25  A    No.  It came back onto Buffalo Road, sir.


                    Wagner - Cross              43


1  Q    I am sorry.  At the time it went onto Downing, as well

2  as it came onto Buffalo Road, was there any vehicle between

3  your vehicle and the white Cadillac?

4  A    I don't recall.

5  Q   When the white Cadillac came back onto Buffalo Road, it

6  did not force any other vehicle on Buffalo Road to swerve to

7  avoid it, correct?

8  A   That's correct.

9  Q   And you were able to observe all this happening from a

10  safe distance, correct?

11  A   That's correct, sir.

12  Q   And it didn't interfere with your ability to drive your

13  vehicle east on Buffalo Road?

14  A   No, that's correct.

15  Q   And it didn't cause any driver who may have been

16  traveling west on Buffalo Road to cause any problems with

17  them coming west on Buffalo Road, is that correct?

18  A   That's correct.

19  Q   Did you even know if there was a vehicle at that time

20  coming west on Buffalo Road?

21  A   I don't recall at this point.

22  Q   But, you are confident that even if there would have

23  been, the white Cadillac did not interfere at all with the

24  westbound traffic on Buffalo Road?

25  A   Say that one more time, please?

Wagner - Cross                    44

1  Q    You are confident that the white Cadillac did not

2  interfere with any traffic that may have been westbound on

3  Buffalo Road?

4  A    Correct.

5  Q    In the area of Buffalo Road and the Downing

6  intersection?

7  A    Correct.

8  Q    The June Street address, you guys from EAGLE had made

9  one controlled purchase from that residence before March 2nd,

10  2005?

11  A    That's correct.

12  Q    Were you involved with that controlled purchase?

13  A    The surveillance.

14  Q    And did you know who the individual was that was the

15  source of the, I assume it was cocaine, that was involved in

16  that controlled buy, is that correct?

17  A    Yes, sir.

18  Q    Did you know who the source of the cocaine was for that

19  transaction, that controlled purchase?

20  A    Yes, I believe the investigation did produce the subject

21   of that.

22   Q   Was the subject arrested based on the controlled

23   purchase?

24   A   At this time, I am not certain if he was indicted for

25   that yet, sir.


                    Wagner - Cross                45


1   Q   And that controlled purchase occurred in January of

2   2005?

3   A   That's correct, sir.

4   Q   Now, prior to the evening of March 2nd, 2005, you had

5   never seen Mr. Fleetwood before, is that correct?

6   A   That's correct, sir.

7   Q   And, to your knowledge, no one on the EAGLE Task Force

8   had seen Mr. Fleetwood before, correct?

9   A   That's correct.

10   Q   And you guys had no information that Mr. Fleetwood

11   particularly was a residence of 448 East 14th Street,

12   correct?

13   A   That's correct.

14   Q   And you had no specific information that Mr. Fleetwood

15   was a resident of the June Street address, is that correct?

16   A   That's correct.

17   Q   Now, the traffic stop was actually conducted per your

18   guys' request by uniformed officers?

19   A   Yes, sir.

20   Q   From the Erie P.D., correct?

21   A   Yes, sir.

22   Q   When the stop was made -- well, the stop was made in the

23   area of 26th Street and Wallace, is that correct?

24   A   Yes.

25   Q   Now, at the time that traffic stop occurred, were you

                    Wagner - Cross                46

1   physically able to watch the stop happen?

2   A   Yes.

3   Q   And you stopped back a little ways from where the stop

4   occurred initially?

5   A   Yes.

6   Q   To let the uniformed officers complete the stop, is that

7   correct?

8   A   Yes.  For -- for a couple reasons.

9        One.  We wanted the uniformed officers to be able

10    to go up and approach the vehicle.  Also being mindful that

11    we're in a plain -- we are in a plainclothes car with

12    plainclothes and we also have considerations that we don't

13    want all of our vehicles exposed in a potential undercover

14    situation.

15    Q    Okay.  So, the uniformed officers who did the stop, is

16    it accurate to say there were two of them, were in a single

17    marked Erie police cruiser?

18    A    Yes, I believe that's correct.

19    Q    And those two officers were the officers that stopped

20    the white Cadillac and then approached the white Cadillac,

21    correct?

22    A    Correct.

23    Q    And one officer went to the driver's side of the vehicle

24    and one officer went to the passenger's side of the vehicle?

25    A    Um, I am not sure how they did it.  I can't recall.

Wagner - Cross                    47

1    Q    And, again, this was occurring as you were hanging back

2    a little bit from the scene of the traffic stop, is that

3    right?

4   A   Yes, sir.

5   Q   And after the stop was conducted and the two uniformed

6   Erie police officers gained control of the situation, you

7   approached the white Cadillac?

8   A   Yes, sir.  It was probably maybe a minute or so and then

9   myself and I believe Corporal Toski, we then approached.

10   Q   Did you approach on foot or in a vehicle?

11   A   On foot.

12   Q   So, you walked up?

13   A   Yes.

14   Q   And at that time, you talked with one of the uniformed

15   officers?

16   A   Yes.

17   Q   Which one?

18   A   I believe at one point, I talked with Officer Fuhrman,

19   and I am not sure if I spoke with another one or not.

20   Q   While Officer Fuhrman came back and talked with you and

21   Corporal Toski, where did that conversation occur with regard

22   to the white Cadillac?

23   A   It was behind the white Cadillac.

24   Q   While you, Toski and Fuhrman are talking, there was

25   another uniformed Erie police officer who was watching the

Wagner - Cross                48

1  occupants of the car, correct?

2  A   Yes.

3  Q   And at that point, all three of the occupants of the car

4  are still in the car, right?

5  A   I believe so, sir.  Yes.

6  Q   And by the time you walked up and started talking with

7  Fuhrman, did Fuhrman have identification for at least two of

8  the three people in the vehicle?

9  A   At one point, and I am not sure if it was on my initial

10  approach, but at one point in talking with Officer Fuhrman --

11  and, again, it may have been another EPD officer.  I am not

12  sure if there was a third EPD officer at the scene -- we

13  had -- I had learned that the front driver did not have

14  identification and that the back driver had produced

15  identification, I think it was Norman Perry from Cleveland,

16  Ohio.

17  Q   You are saying the front driver.

18  A   I'm sorry.  The front passenger.

19  Q   But, you don't know if Fuhrman, or whatever Erie P.D.

20  officer who supplied that information to you, had that

21  information as you first walked up to the Cadillac, or if it

22  took some more time for that information to be passed on?

23  A   Yes, I am not a hundred percent certain on that, when

24  that came.

25  Q   Did you tell the uniformed officers what the basis of

                        Wagner - Cross              49

1  the stop was?

2  A   Um, we -- I believe that I indicated to one of them that

3  we -- that they had come from an address that we had been

4  investigating for drugs and that we had traffic violations

5  tonight, that night.

6  Q   Did anybody start writing traffic citations?

7  A   No.

8  Q   Now, while -- is it accurate to say that all these

9  conversations you are talking about with the Erie P.D., at

10  least at this point, are all back behind the white Cadillac,

11  correct?

12  A   Yes, I believe so.

13  Q   And while the -- whatever uniformed Erie P.D. officer

14  who is doing this is talking with you and Toski in the back

15  of the white Cadillac, there is at least one other uniformed

16  Erie police officer, perhaps more, who is watching the three

17  occupants of the vehicle?

18  A    Yes, I believe there was one.  Another -- I can't say

19  with certainty, sir, because I can't say that I absolutely

20  observed an EPD officer standing there watching the people.

21  I can't say for certain.  But, that would not surprise me

22  that there would be.

23  Q    Well, as a general matter of police protocol, would you,

24  as a police officer, feel comfortable with you and all the

25  other officers on the scene standing behind a vehicle that's

                    Wagner - Cross              50

1  been stopped that has three occupants in it with nobody

2  physically watching the three occupants?

3  A    No.

4  Q    Now, after you are told that at least one of the men

5  that were in the car has produced an I.D. that indicates he

6  is from Cleveland, you decide that you want to investigate

7  further?

8  A    It was -- yes, at the same time we -- I believe it was

9   at the same time we found out that the front passenger had no

10  identification.

11  Q   And, again, that was the front passenger that had no

12  identification, correct?

13  A   Correct.

14  Q   Not the person driving the vehicle?

15  A   Correct.

16  Q   The person driving the vehicle produced a valid driver's

17  license, as far as you knew?

18  A   I don't know.

19  Q   So, you learned that the front passenger doesn't have

20  I.D., the back passenger does have some I.D.?

21  A   Yes.

22  Q   You and Toski determine that you want to talk with the

23  passenger, the front seat back -- and the back seat

24  passenger, correct?

25  A   I don't know if we decided we wanted to talk to them.  I

Wagner - Cross              51

1   think then it was decided that the front seat passenger would

2   be asked to step out of the vehicle.

3   Q   For what reason?

4   A    To further the investigation, I assume.  We discussed

5   the matter and Officer Fuhrman said we decided that he would

6   be asked to step out of the vehicle, and he stepped out of

7   the vehicle and he was asked to come to the back towards the

8   rear, and he did.

9   Q    To further the drug investigation, he was going to be

10  asked to step out of the vehicle?

11  A    Yes.

12  Q    And this was a decision that you and Toski, as the Eagle

13  Task Force guys who were doing the drug investigation, made?

14  A    And in conjunction with Officer Fuhrman as well.

15  Q    Well, Fuhrman wasn't investigating, you know, drug

16  activity in the city that night, was he?

17  A    No.

18  Q    He was on general patrol, correct?

19  A    Correct.

20  Q    He made a traffic stop at you guys, meaning the Eagle

21  Task Force, direction?

22  A    Yes, correct.

23  Q    So, Fuhrman wasn't the one who was deciding how the drug

24  investigation was going to be conducted, right?

25  A   Right.


Wagner - Cross            52


1   Q    You and Toski were the guys that decided how to conduct

2   the drug investigation activity that night that, correct?

3   A   Yes.

4   Q    And you and Toski decided that you guys wanted to talk

5   with the front passenger and the back seat passenger to

6   further your drug investigation?

7   A   Yes.

8   Q    But, you were going to have uniformed officers ask for

9   the passengers to get out of the vehicle, correct?

10  A   Correct.

11  Q    Because they are in uniform and have the show of

12  authority to do that kind of thing, correct?

13  A   Well, they had already made the traffic stop so it was

14  logical.

15  Q    And then it was after Mr. Fleetwood stepped out of the

16  vehicle that this baggie was seen drop, correct?

17  A   Yes.

18  Q    And, in fact, while he was in the vehicle, he was asked

19  if he had any drugs on him and he said no, correct?

20  A  I believe that's correct.

21       MR. PATTON:  Could I have a moment, Your Honor?

22       THE COURT:  Yes.

23       MR. PATTON:  Those are my questions, Your Honor.

24       THE COURT:  Any redirect?

25       MR. PICCININI:  Yes, Your Honor.


                 Wagner - Redirect            53


1       THE COURT:  Mr. Piccinini.

2                 REDIRECT EXAMINATION

3  BY MR. PICCININI:

4  Q   Trooper Wagner, you were asked several questions first

5  about, well, your knowledge as to the location of Corporal

6  Toski and Trooper Houk at the time they made their

7  observations.

8       Do you know, from the information that was related

9  to you, that they at least observed the Cadillac located in

10  the vicinity there on the East 14th Street?

11  A  Yes, sir.

12  Q   When you arrived at the area where their observation of

13  the white Cadillac was, that description fit the description

14  of the white Cadillac that was at that address, correct?

15  A    Yes, sir.

16  Q    And did they provide to you information concerning the

17  license plate that they had observed obscured by snow and

18  were concerned about the numbers?

19  A    Yes, sir.

20  Q    And when you got to the vicinity, were you able to

21  confirm, first of all, that the first letter of the license

22  plate was obscured by snow?

23  A    Yes, sir.

24  Q    But, you were able to see it -- just so it is clear to

25  the Judge, they indicated there was a concern, you confirmed

Wagner - Redirect            54

1   that there was a concern about the license plate being

2   obscured by snow, but you were able to drive by and

3   accurately identify the license plate?

4   A    Yes, sir.

5   Q    And you had with you the foreknowledge already knowing

6   that they had run it and that particular letter came back to

7   the Cadillac, the F at the beginning came back to the

8   Cadillac?

9   A   I believe at that point I did.

10   Q   You were just confirming whether or not what they had

11   run on two occasions was accurate?

12   A   Yes, sir.

13   Q   But, as far as where they were located, they were able

14   to make observations of the Cadillac in that vicinity?

15   A   Yes, sir.

16   Q   And was that vicinity suspicious to members of the Eagle

17   Task Force?

18   A   Yes, sir.

19   Q   Trooper, there are other traffic violations discussed,

20   but was the license plate obscured by snow?

21   A   Yes, sir.

22   Q   There were also questions about your previous

23   observations of East 14th Street and the trash that had been

24   pulled from that location.

25       Separate and apart from which unit inside the

Wagner - Redirect          55

1   East 14th Street residence that may have been involved in

2   drug activity in that trash pull from that particular

3  structure, were multiple baggies consistent with the delivery

4  of cocaine located?

5  A   Yes, sir.

6  Q   And did that heighten the suspicions?

7  A   Yes, sir.

8  Q   And did you have -- were you armed with that evening

9  information that drug dealers from Cleveland were attempting

10  to get a foothold in the Erie area and were involved in drug

11  activity in the proximity where you were conducting an

12  investigation?

13  A   Yes, sir.

14  Q   Just so it is clear to the Court, was this, from your

15  standpoint, a drug investigation?

16  A   Yes, sir.

17  Q   In the course of a drug investigation, is it wise for

18  you, in making determinations as to whether and how to stop a

19  vehicle, to completely disregard violations of the

20  Pennsylvania traffic laws?

21      While you are conducting an investigation, should

22  you just forget about the traffic violations and not use them

23  as a basis to conduct a stop?

24  A   No, sir.

25  Q   Does it provide a benefit that in the course of a drug

Wagner - Redirect              56

1   investigation if the individual under investigation foolishly

2   makes very blatant violations of the traffic laws that you

3   can conduct a stop for that purpose?

4   A   Yes, sir.

5   Q   You weren't a person on patrol this night to conduct

6   traffic stops, were you?

7   A   No.

8   Q   But, in the course of your investigation, not only did

9   you observe the obscure license plate but, as reflected on

10  Government Exhibit 1, did you, observing the vehicle

11  traveling on Buffalo Road, did you see it almost blow through

12  the stop light at the intersection of East Avenue?

13  A   Yes, sir.

14  Q   Did you make that observation?

15  A   Yes, sir.

16  Q   Is it legal for you to blow through a stop light at an

17  intersection without stopping?

18  A   No.

19  Q    And then further down on Buffalo Road when it got into

20  the vicinity of Downing Avenue, did you see the vehicle

21  signal to turn, turn onto Downing Avenue and then swerve back

22  onto Buffalo Road?

23  A    Yes, sir.

24  Q    Now, counsel asked several questions about whether there

25  were any vehicles around.

                    Wagner - Redirect              57

1            In your training as a trooper conducting traffic

2  investigations, was it ever your requirement when someone

3  violated a traffic law to see whether anyone else was around

4  at the time the traffic violations occurred?

5  A    No, sir.

6  Q    If it is at two o'clock in the morning and you travel up

7  to an intersection and there is nobody around, is it okay to

8  blow through a stop sign?

9  A    No, sir.

10  Q    Is it okay to swerve off into a turn and then back onto

11  the roadway?

12           Is it okay and is it not a violation of the traffic

13  laws just because no one is around?

14  A    No, it is not okay, sir.

15  Q    You were also questioned concerning your testimony at

16  the detention hearing.

17        And just so the record is clear, at the detention

18  hearing on March 8, 2005, was that hearing itself solely the

19  detention hearing not a hearing set for the government to

20  establish probable cause concerning crimes?

21  A    It was my understanding it was a detention hearing.

22  Q    In preparation for the detention hearing with regard to

23  the defendant's risk of flight and danger to the community,

24  were you prepared to testify in front of Judge Baxter about

25  this man's use of false name, incorrect Social Security

                        Wagner - Redirect              58

1  numbers, and other personal information to give the Court an

2  indication that he posed a risk of flight?

3  A    Yes, sir.

4  Q    And that was your -- that was what you were called to

5  testify about and that was the concern?

6  A    That's correct, sir.

7  Q    On your initial direct examination, were you questioned

8   at all by the government concerning the details of the

9   traffic stop and all those things?

10  A    No, sir.

11  Q    In the course of that examination, however -- During the

12  course of Mr. Patton's cross-examination, did he attempt, and

13  was successful because the Court provided him permission, was

14  he able to question you far beyond what you had talked about

15  on direct examination?

16  A    Yes, sir.

17  Q    And in the course of this particular inquiry, this is

18  back on March 8th close in time to the event itself, did you

19  specifically testify on cross-examination about the license

20  plate being partially blocked?

21        And I show you on page eighteen of the transcript,

22  even back then close in time to this event, did you testify

23  that the license plate was partially -- some of the letters

24  on it was partially blocked?

25  A    Yes, sir.


                    Wagner - Redirect              59


1   Q    And, further, did you explain, even back then on

2   March 8, notes or no notes, report or no report, close in

3    time, Trooper Houk attempted to run the vehicle registration

4    one particular way and didn't get an appropriate response and

5    tried it a second way and then asked me to confirm when I

6    went by what the vehicle registration plate was, so you

7    testified to all that all the way back in the detention

8    hearing when first cross-examined by defense counsel?

9    A    Yes, sir.

10   Q    In addition, counsel asked you, well, did you ever

11   testify that it was on Buffalo Road as to the location, or

12   did you ever testify in the detention hearing as to the

13   location?

14         Do you recall ever being asked a question by

15   counsel or the government as to the specific location?

16   A    No, sir.

17   Q    And on page twenty-one of the transcript in Mr. Patton's

18   examination of you, he specifically says:

19         What were the numerous traffic violations that you

20   observed?

21         Did Mr. Patton ask you where those traffic

22   violations were observed?

23   A    No, sir.

24  Q    Was it the purpose of your testimony at the detention

25  hearing to discuss the location of the traffic violations?


Wagner - Redirect                60


1   A    No, sir.

2   Q    And there at the detention hearing, was it your purpose

3   to put forth before the Magistrate Judge all of the reasons

4   under the Fourth Amendment why the traffic stop could be

5   conducted?

6   A    No, sir.

7   Q    In our preparation for the detention hearing, was it a

8   discussion about how can we prepare the Fourth Amendment

9   issues so that Judge Baxter can rule on an issue that is not

10  before her?

11  A    No, sir.

12  Q    Here on page twenty-one, again, you were asked what were

13  the numerous traffic violations you observed.  Once again,

14  back on March 8, 2005, close in time to the events, you

15  specifically said that you observed the operator of the

16  vehicle proceed into an intersection, at a red light

17  partially into the intersection.  Is that consistent to what

18  you testified here today?

19  A   Yes, sir.

20  Q   Also observed the operator of the vehicle indicate to

21  make a southbound turn, swerve, make the turn and then swerve

22  back onto the road.

23       Now, you testified to that back on March 8th, is

24  that correct?

25  A   That's correct, sir.


                    Wagner - Redirect              61


1  Q   But, nobody ask asked you what the location was?

2  A   That's correct.

3  Q   Now, after the detention hearing and even in preparation

4  for this hearing, did you have the opportunity to review the

5  criminal complaint?

6  A   Yes, sir.

7  Q   And after having done so prior to being questioned by

8  counsel, in paragraph seven of the affidavit drafted by my

9  office and signed by you and sworn and signed by you,

10  correct?

11  A   That's correct.

12  Q   Did you observe that on paragraph seven on your own that

13  there was an inaccuracy with regard to the nature of the

14  direction of travel?

15  A   Yes, sir, I did.

16  Q   Did you, not only in preparation for today's hearing but

17  previously, make it known to government counsel that you were

18  concerned that that discrepancy was in there?

19  A   Yes, sir, I did.

20  Q   And was it something that you were prepared to testify

21  about today?

22  A   Yes, sir.

23  Q   Did you intentionally lie when you said that the vehicle

24  was traveling west on East 26th Street?

25  A   No, sir.


                    Wagner - Redirect            62


1  Q   And is your recollection now, as it was back then, that

2  the vehicle when it committed the traffic violations was

3  traveling on Buffalo Road?

4  A   Yes, sir.

5  Q   And do you recall the violation at East Street and

6  Downing Avenue?

7  A   Yes, sir.

8  Q    Now, also in your criminal complaint, in the criminal

9  complaint, is it your intention to set forth the probable

10  cause supporting the charges?

11  A    Yes.

12  Q    Is this document meant to be a document by you

13  explaining to the Court all of the facts and circumstances

14  under the Fourth Amendment explaining why a traffic stop was

15  conducted?

16  A    No, sir.

17  Q    And in this particular case in paragraph ten of your

18  complaint, you sum up and say:

19        Based upon my knowledge and experience, the

20  evidence seized from the defendant and the circumstances

21  surrounding the case were consistent with several ounces of

22  cocaine being possessed for distribution.

23        The circumstances surrounding the case, back at the

24  time you signed the criminal complaint, did those

25  circumstances include those things that you knew that night

Wagner - Redirect                63

1  on March 2nd about the trash pulls, the controlled buy, the

2  vehicle approaching 2125 June Street, the vehicle being in

3  the vicinity of East 14th Street, are all those things, kind

4  of in the whole mix, the totality in what you considered on

5  March 2nd, 2005, and how you approached the case?

6  A    Yes, sir.

7  Q    And from January, 2005, to March, 2005, was this an

8  ongoing investigation of this drug dealing activity from

9  individuals from Cleveland in that vicinity?

10  A    Yes, sir.

11  Q    Now, with regard to the traffic stop itself, when the

12  traffic stop was conducted, is it the Erie Police Department

13  that's in charge of the actual execution of the traffic stop?

14  A    Yes.

15  Q    And you didn't request Mr. Fleetwood to get out of the

16  vehicle, did you?

17  A    No, I did not.

18  Q    Or the decision to or the actual command for him to get

19  out of the vehicle didn't come from you?

20  A    No, it did not.

21  Q    And do you know what concerns that the patrol officers

22  that were standing there had with regard to Mr. Fleetwood

23  that caused them to request that he get out of the vehicle?

24  A   Not exactly.

25  Q   And then finally, just so the record is clear on this,


                    Wagner - Recross              64


1   with regard to the dictating of your report, March 8, 2005,

2   have you engaged in conversations with government counsel or

3   others where you purposely avoid drafting your report so that

4   counsel can't get it at a detention hearing?

5   A   No.

6   Q   Is that something you ever discussed?

7   A   No.

8   Q   Is that something that you even care about?

9   A   No.

10  Q   And do you know that in time, in the posture of the

11  case, counsel will get a copy of it anyway?

12  A   I would assume, so.

13  Q   And with regard to any notes, as I understand it, you

14  don't even know if you took notes in this particular case?

15  A   Other than what I have testified to with the interviews,

16  I am uncertain about any other notes, sir.

17  Q   If those notes existed, they it would be in the 1-A

18  section of the --

19  A   It is very likely they would be in the 1-A section.

20                    RECROSS-EXAMINATION

21  BY MR. PATTON:

22  Q   What was the traffic violation that you observed at the

23  intersection of Buffalo Road and Downing?

24  A   The individual improperly put on turn signals and did

25  not turn completely on the roadway and pulled back on.


                    Wagner - Recross              65


1        It could also be considered probably either

2  reckless or careless driving, I would say probably, whichever

3  is the least offensive of the two, I would say it would be

4  that one.

5  Q   Well, what does -- what has to occur for that violation

6  to have occurred?  What facts have to have happened for there

7  to be a careless driving?

8  A   I can't remember the exact wording in the Vehicle Code,

9  but it's driving in a manner that is careless.  To me, that

10  is careless, putting on your turn signal, turning onto a road

11  and swerving back onto another road.

12        So, I would imagine the section would be

13   inappropriate use of turn signals and/or careless driving.

14   Q   Now, you just testified that before the hearing today,

15   you believed your sworn affidavit in support of your criminal

16   complaint was inaccurate?

17   A   That what?

18   Q   That before you testified in this hearing today, you

19   believed that your sworn affidavit in support of the criminal

20   complaint was inaccurate?

21   A   Yes.

22   Q   You never mentioned that in your direct testimony, did

23   you?

24   A   No.

25   Q   You never said to the Court, hey, I -- a sworn affidavit

                    Wagner - Recross              66

1   signed by me, sworn to by me has been filed in this case that

2   I believe is inaccurate and wrong so I want to put the Court

3   on notice that it is wrong so that the record can be

4   corrected?  You didn't do that?

5   A   No.

6   Q   Now, at the detention hearing your criminal complaint

7   was specifically introduced into evidence to support the

8   government's case, wasn't it?

9   A   Yes, sir.

10  Q   And at that time, when your sworn affidavit was being

11  used in a court proceeding where the government was asking a

12  Federal Magistrate Judge to use the information in your

13  complaint in making a decision in a criminal case, you did

14  not say, hey, wait a minute, there is something wrong in that

15  affidavit and I want it to be corrected so that I don't even

16  unintentionally mislead the Court?

17          You didn't do that, did you?

18  A   No.

19  Q   And when you were being cross-examined by me with regard

20  to what the traffic violations were, your criminal complaint

21  would have been introduced into evidence and would have been

22  relied upon by the government in its case in chief, correct?

23  A   I believe.

24  Q   On page four of the transcript of the detention hearing,

25  does it say:


                    Wagner - Recross              67


1           In addition to the criminal complaint that was

2  filed in this case was captioned --

3  A   Yes.

4  Q   -- and was moving to identify it, just -- when it says:

5      Mr. Piccinini's opportunity to present evidence on

6  behalf of the government's case, he asked the Judge to take

7  judicial notice of the Pretrial Services report and the

8  details provided in that, correct?

9  A   Yes.

10  Q   And he also then says:

11      In addition the criminal -- to the criminal

12  complaint that was filed in this case was captioned

13  United States of America versus Michael R. Johnson, and he

14  moves that that be amended to show that also known as, AKA,

15  as Kenneth Ray Fleetwood, and that Mr. Piccinini is asking

16  Judge Baxter to consider the complaint in support of the

17  request for detention.  Do you see that?

18  A   Yes.

19  Q   And you were sitting right next to Mr. Piccinini at

20  counsel table when he did that, correct?

21  A   Right.

22  Q   This is before you got on the witness stand to give your

23  testimony in support of the government's detention motion,

24  correct?

25  A    Yes, sir.

Wagner - Recross                68

1  Q    So, at the time you were questioned at the detention

2  hearing about what specific traffic violations occurred, your

3  sworn testimony through your criminal complaint or the

4  affidavit in support of the criminal complaint was part of

5  the record, correct?

6  A    I guess, yes.

7  Q    And that criminal complaint or the affidavit in support

8  of the criminal complaint stated under oath that those

9  violations occurred while the white Cadillac was westbound on

10  East 26th Street, correct?

11  A    Yes.

12  Q    Anytime before today's hearing, did you call me up and

13  say, hey, Mr. Patton, I just want to let you know that my

14  sworn affidavit in support of the criminal complaint is

15  wrong?  Did you ever do that?

16  A    No.

17  Q    But, you let the U.S. Attorney's Office know?

18  A   Yes.

19  Q   But, you didn't tell the Court?

20  A   No.

21  Q   And you didn't tell me?

22  A   No.

23  Q   Now, Mr. Piccinini asked you about the purpose of the

24  criminal complaint or the affidavit in support of the

25  criminal complaint, correct?

Wagner - Recross          69

1       Do you remember those questions?

2  A   Yes.

3  Q   And he asked you about the purpose of that being to

4  establish probable cause for the offense, correct?

5  A   Yes.

6  Q   Now, Mr. Fleetwood was charged with possessing crack

7  cocaine with intent to distribute, correct?

8  A   Yes.

9  Q   And those charges are based on the bags of crack cocaine

10  that he dropped or was found on his person at the traffic

11  stop, correct?

12  A   Yes.

13  Q   And even if you had no idea in the world where

14  Mr. Fleetwood got those bags of crack cocaine, if you had

15  been told he's pulled out of a car and he has got this amount

16  of crack cocaine on him, you could give the opinion, based on

17  your experience, that he possessed crack cocaine with intent

18  to distribute, correct?

19  A   Yes.

20  Q   Because of the amount of crack cocaine that's involved,

21  is that right?

22  A   Yes.

23  Q   Doesn't matter if you saw him coming out of a house that

24  was suspected of dealing crack cocaine or not, would it?

25  A   No.

Wagner - Recross            70

1  Q   You would be able to say, based on your experience, if a

2  guy is found with an ounce of crack cocaine on him, he is

3  possessing it with intent to distribute?

4  A   It was more than an ounce.

5  Q   If he is found with more than an ounce of crack cocaine

6  on his person, you can testify, based on your experience,

7   that crack cocaine is possessed with intent to distribute,

8   correct?

9   A   Yes.  I believe he also had a scale on his person.

10  Q   All right.  So, if you have a guy that is arrested with

11  more than an ounce of crack cocaine and a scale on his

12  person, you would be able to testify, based on your

13  experience, that that person possessed those drugs with

14  intent to distribute, correct?

15  A   Yes, sir.

16  Q   You wouldn't have to provide any more information about

17  what residence you saw the guy come out of, what residence

18  you saw the guy drive to to be able to give your opinion,

19  based on your experience, that that crack cocaine was

20  possessed with intent to distribute?

21  A   I don't know how to answer your question.

22  Q   Well, sir, you just testified that if the only

23  information you had was that someone was arrested with more

24  than an ounce of crack cocaine on them and with a scale,

25  based solely on that knowledge, you would be able to, based

Wagner - Recross          71

1  on your experience, say I believe that there is probable

2  cause to believe that that person possessed that crack

3  cocaine with intent to distribute, correct?

4  A    That sounds fair.

5  Q    So, to establish -- and those were the facts that you

6  had in this case of what you knew after Mr. Fleetwood stepped

7  out of the car, correct?

8  A    Yes.

9         THE COURT:  Wasn't there also a considerable amount

10  of cash in his pockets?

11        THE WITNESS:  Yes, sir.

12  BY MR. PATTON:

13  Q    So, to establish probable cause for the offense of

14  charging Mr. Fleetwood with the offense of possessing crack

15  cocaine with intent to distribute, you could have simply put

16  in he was asked to be -- he was found to be in possession of

17  over an ounce of crack cocaine and scales and a large amount

18  of money, and based on my experience as a Pennsylvania State

19  Police Trooper trained in the investigation of drug offenses,

20  that he possessed that crack cocaine with the intent to

21  distribute, correct?

22  A    May have been able to.

23  Q    But, in your affidavit you put in the information about

24  the 448 East 14th Street address, correct?

25  A    Yes, sir.

Wagner - Recross                72

1  Q    And you put in the information about the address at

2  June Street, the 2125 June Street address, correct?

3  A    Yes.

4  Q    In addition to what was found after Mr. Fleetwood was

5  taken out of the car, correct?

6  A    Yes, sir.

7  Q    But, you didn't put in there in your affidavit that the

8  basis for the stop was that you felt you had reasonable

9  suspicions to believe that he was involved in a drug

10  activity, correct?

11  A    Correct.

12  Q    Now, on your cross-examination, you and I talked about

13  what happened at the scene of the traffic stop.

14        Do you remember that?

15  A    Yes.

16  Q    And do you remember when we talked about the uniformed

17  police officers and you and Toski standing behind the white

18  Cadillac talking?

19  A   Yes.

20  Q   You remember that?

21  A   Yes.

22  Q   You remember us saying at that point in time all the

23  people are still in the vehicle?  Do you remember that?

24  A   Right.

25  Q   And you remember when you testified that you and Toski

Wagner - Recross          73

1  made the decision that you wanted to talk with the passenger,

2  the front seat passenger and the rear seat passenger to

3  further your drug investigation?

4  A   Yes, sir.

5  Q   And you remember saying that you didn't have -- you then

6  had the Erie uniformed police officers get Mr. Fleetwood out

7  of the car so you could do that investigation?

8  A   Right.

9  Q   Is that what happened?

10  A   It kind of happened the way, when we were all talking, I

11  believe it was Officer Fuhrman when we were standing back

12  there, we were talking, we explained to him the events that

13  had taken place.  It was very brief.  We were looking at

14  these guys.  The Eagle Task Force, this is who we are.  And

15  as we were talking, it was more of a collective kind of

16  effort as this transpired, because I remember we had -- the

17  one guy's identification was from Cleveland.  The other guy

18  didn't have identification.  And I think it was kind of a

19  collective kind of decision that this guy -- you know, this

20  guy should be asked to step out of the vehicle.

21  Q   To talk about possible drug offenses?

22  A   Yes.

23  Q   He wasn't taken out of the vehicle to talk to him about

24  the license plate being partially obscured by snow, was he?

25  A   No.


                    Wagner - Recross              74


1  Q   Wasn't asked to get out of the vehicle to talk about

2  whether the car had gone into an intersection at a red light,

3  was he?

4  A   No.

5  Q   He wasn't asked to get out of the vehicle to see if the

6   driver had engaged in offensive, careless driving?

7   A   No.

8   Q   He wasn't getting out of the car for fear of officer

9   safety, was he?

10   A   Right.  That I don't know.

11   Q   You just said that you guys talked about it and decided

12   you wanted him to come out of the vehicle to further your

13   investigation into the drug activity, correct?

14   A   That's correct.

15   Q   That is why he was asked out of the vehicle, correct?

16   A   But, part of furthering a drug investigation, too, that

17   is, we are there at the scene and he has no identification

18   and we have information that there are people in town from

19   Cleveland, Ohio, associated with this address and the stop is

20   ade, he is in the front seat, I got no I.D.  And Officer

21   Fuhrman said, and we all kind of said we need to have this

22   guy step out of the vehicle.  And at that time, too, you

23   don't know, you just saw a drug deal take place up on

24   June Street, whether they were dropping off or picking go

25   picking up, you don't know this information.

Wagner - Recross                75

1        So, at that point, it was -- there is more than one

2    reason, is what I am trying to get at, counselor.  There is

3    an issue of officer safety.  Ten o'clock at night when you

4    have a traffic stop going on and all this side information is

5    taking place, and you have the people from Cleveland and one

6    guy in the back is identified as a resident of Cleveland,

7    Ohio, the individual has no identification in the front seat,

8    that's a partial consideration.

9        So, I can't exclude that, is what I am getting at.

10   Q   You can't exclude it.  That doesn't mean it was the

11   reason you asked him to get out of the car?

12        You wanted him out of the car to ask him about your

13   drug investigation, correct?

14   A   Partially, yes.

15   Q   You had just been standing at the back of the car

16   talking with the officers with -- a couple of minutes with

17   him inside the car, correct?

18   A   Yes.

19   Q   With an officer watching the occupants of the car,

20   correct?

21   A   I am assuming an officer did, yes.

22   Q   So, you felt safe enough to be at the back of the car

23   talking with Toski and Fuhrman about what you guys were going

24   to do to further your investigation, you felt comfortable

25   with your safety to do that while somebody was -- Erie P.D.

Wagner - Recross              76

1   is watching the occupants of the car, correct?

2   A   Okay.

3   Q   Well, correct?

4   A   Yes.

5   Q   Yes?

6   A   Yes.

7   Q   So, at that point, you weren't so concerned about

8   officer safety that you had to say we had to get the guy

9   immediately out of the car for our own safety, correct?

10   A   At that point, yes.

11   Q   When the Erie P.D. guys pulled them over, they didn't

12   ask everybody to get out of the vehicle immediately, correct?

13   A   Correct.

14   Q   They allowed the people to stay in the vehicle, correct?

15   A   Right.

16   Q   Told the people in the vehicle to put their hands up and

17  put their hands where officers could see them, correct?

18  A   I don't know about that.

19  Q   And kept the people in the vehicle while you guys

20  decided what you were going to do with the situation,

21  correct?

22  A   Correct.

23  Q   And it was after you guys kicked it around a little bit

24  and decided that we wanted to talk to the two male passengers

25  to further our drug investigation, that's when they were

                    Wagner - Recross              77

1  asked to get out of the car?

2  A   Yes.

3  Q   Okay.  Now, you said that maybe a minute or two had

4  passed from the point in time that the Erie P.D. guys did the

5  stop and when you and Toski approached on foot, is that

6  correct?

7  A   Yeah; a minute, yeah.

8  Q   And then Fuhrman came back and started talking to you

9  guys, correct?

10  A   Yes.

11  Q    And you guys were checking out the I.D.'s, correct?

12  A    The I.D., yeah.

13  Q    And you guys ran -- you ran the I.D.'s to see if there

14  were any warrants or anything on them?

15  A    I don't -- I didn't.  I don't know if EPD did or not.

16  Q    Did you get any information -- did anybody come up and

17  say, hey, we ran this and these people are clean?

18  A    Not that I remember.

19  Q    So, you and Toski and Fuhrman are back in the back of

20  the car talking about this stuff, correct?

21  A    Correct.  Yes, sir.

22  Q    While the three guys are in the back of the car,

23  correct?

24  A    Yes.

25  Q    You assumed being watched by an Erie police officer?

Wagner - Redirect            78

1  A    Correct.

2  Q    And you guys are kicking it back and forth about what

3  information you have among yourselves, right?

4  A    Yes.

5  Q    And you're talking for several minutes?

6  A   Yeah; a minute or so; two minutes, yes.

7  Q   And all this time, the three occupants of the vehicle

8  are being left in the vehicle, correct?

9  A   Yes.

10  Q   While you guys are doing all this discussing, correct?

11  A   Yes.

12  Q   And no one is asked to get out of the vehicle until it

13  is decided that you want to talk to the passengers to further

14  your drug investigation, is that correct?

15  A   Yes.

16       MR. PATTON:  Those are my questions, Your Honor.

17       MR. PICCININI:  Your Honor, could I just clear up

18  two things?

19       THE COURT:  Yes.

20            REDIRECT EXAMINATION

21  BY MR. PICCININI:

22  Q   First of all, with regard to officer safety, in your

23  many years of experience, at ten o'clock at night, in this

24  particular neighborhood where this stop occurred, and in

25  light of the nature of the drug investigations, separate and

                    Wagner - Redirect            79

1  apart from the investigative activity, just from a practical

2  standpoint, does this pose a significant concern for officer

3  safety to have Mr. Fleetwood remain sitting in the vehicle

4  unidentified being at this location without removing him from

5  the vehicle?

6  A    Yes, it could, sir.

7  Q    And is it wise to remove the passenger from the vehicle

8  from a law enforcement safety standpoint?

9  A    Yes.

10  Q    And obviously you are going to further your

11  investigation as well, are you not?

12  A    Sure.

13  Q    And with regard to the mistake on the complaint, prior

14  to coming in here today, did you disclose that to government

15  counsel?

16  A    Yes.  Yes, sir.

17  Q    And was it the government counsel who indicated to you

18  that we would deal with that issue on direct examination

19  because it wasn't a matter to hide so we would get it out?

20  A    That's correct, sir.

21  Q    And if there was no questioning about that on direct

22  examination, is that on you or is that on government counsel

23  for not asking you the question?

24  A   It would be on government counsel for not asking the

25  question.

Wagner - Redirect              80

1  Q   And I failed to do so.  But, you disclosed the issue to

2  me?

3  A   Yes, sir.

4  Q   Likewise, would it be your practice to call up defense

5  counsel and advise him about contexts of things, or is it

6  your obligation to advise counsel about that?

7  A   I would advise government counsel.

8  Q   And in your experience, whose responsibility is it to

9  advise Mr. Patton on that error?  My responsibility, isn't

10  it?

11  A   That's correct.

12  Q   And whose fault would it be if the Judge wasn't told

13  about the mistake?  It would be on me, not you, wouldn't it?

14  A   Yes.

15     MR. PICCININI:  That is all I have, Judge.

16      THE COURT:  Thank you, officer.

17  BY MR. PATTON:

18  Q   Sir, and officer safety --

19      THE COURT:  Oh, come on.

20      MR. PATTON:  Judge, he asked a question

21  concerning -- I would ask one question --

22      THE COURT:  All right.

23          RECROSS-EXAMINATION

24  BY MR. PATTON:

25  Q   If you were concerned with officer safety, why, when you


            Wagner - Redirect            81


1  walked up to that vehicle, did you not say get everybody out

2  of the car?

3  A   Say this again.

4  Q   If you were concerned with your -- with officer safety,

5  your safety and the other officers there, why did you not,

6  when you first walked up to the white Cadillac that was

7  stopped, tell the Erie Police Department, guys, get everybody

8  out of the vehicle?

9  A   Because I don't think that you correct a problem of

10  potential officer safety by creating chaos and having three

11   people -- you have to control the situation at first, and

12   that's what was done.

13        Just to correct a problem of officer safety, you

14   just don't tell everybody to -- you wouldn't make a blanket

15   statement and have all three occupants get out of the vehicle

16   and standing there at night in the street with cars going by

17   and people going by.

18   Q   So, you want to get control of the situation first?

19   A   Yes.

20   Q   And the uniformed officers had control of the situation?

21   A   Correct.

22   Q   And had control of the three people that were in the

23   vehicle?

24   A   Initially, yes.

25   Q   And all that occurred before Mr. Fleetwood was then

                    Smith - Direct              82

1   asked to get out of the vehicle?

2   A   Yes.

3        MR. PATTON:  Those are my questions.

4        THE COURT:  Thank you, trooper.

5          THE WITNESS:  Thank you, sir.

6          THE COURT:  And you'll check to see about any

7   missing notes and try to get back to them as soon as you can?

8          THE WITNESS:  I will definitely check, sir.

9   (The witness was excused.)

10          THE COURT:  All right.  We'll take a break until

11   ten after eleven.

12   (Court recessed at 10:55 a.m.)

13   (Court reconvened at 11:10 a.m.)

14          THE COURT:  Be seated, please.

15          Call your next witness, Mr. Piccinini.

16          MR. PICCININI:  Yes, Your Honor.

17          At this time, I would call Officer Royce Smith to

18   testify.

19          THE COURT:  Would you come forward here and be

20   sworn, please?

21          THE CLERK:  Raise your right hand.

22                    * * * * *

23          ROYCE SMITH, having first been duly sworn,

24   testified as follows:

25          THE COURT:  Have a seat up here, please, give us

1  your name and spell your last name.

2          THE WITNESS:  First name is Royce, R-o-y-c-e.  Last

3  name Smith, S-m-i-t-h.

4          THE COURT:  Thank you.

5                  DIRECT EXAMINATION

6  BY MR. PICCININI:

7  Q    Sir, how are you employed?

8  A    I'm a patrolman with the City of Erie, Bureau of Police.

9  Q    And how long have you been employed with the Bureau of

10  Police?

11  A    Six years.

12  Q    And currently what is the nature of your job with the

13  Erie Police Department?

14  A    I am a patrolman.  I patrol the streets of Erie.

15  Q    Is there any particular zone or area in the City of Erie

16  that you patrol on a regular basis?

17  A    Normally I patrol the lower east side.

18  Q    In the lower east side, or are there areas of lower east

19  side that are known for a high incidence of crime or drug

20  trafficking activity?

21  A   Yes, there is.

22  Q   And in your experience with the Bureau of Police, have

23  you encountered those types of drug dealing situations in the

24  past?

25  A   Yes, I have.

                    Smith - Direct              84


1   Q   And from an officer's standpoint, when you mix drugs and

2   criminal activity with the law enforcement job, does it pose

3   a heightened risk of safety in which you deal with your job

4   on a daily basis?

5   A   Yes.

6   Q   If you can draw your attention to March 2nd, 2005,

7   around ten or ten fifteen that evening, were you on duty --

8   in uniform and on duty that particular date?

9   A   Yes, I was.

10  Q   What was the nature of your patrol that night?

11  A   I was in a two-man unit.

12  Q   Who was your partner?

13  A   Officer Cousins.

14  Q   And at some point in time, did you receive a radio

15  broadcast or information from the dispatch concerning the

16  need to assist in any traffic stop on behalf of the Eagle

17  Task Force?

18  A    Yes, I did.

19  Q    And were you able to actually hear that there had been a

20  request for assistance over a radio broadcast?

21  A    Yes.

22  Q    And did you get a general description of the vehicle

23  that was involved, its license plate and the vicinity where

24  it may be for purposes of traffic stops?

25  A    Yes.

Smith - Direct                85

1  Q    Did you proceed to that location?

2  A    Yes, we did.

3  Q    And where did you go in the City of Erie in order to

4  encounter the people whose vehicle was stopped?

5  A    We traveled eastbound across 26th Street until we

6  encountered the vehicle at 26th and Wallace.

7  Q    And when you arrived at that location, can you describe

8  for Judge Cohill how the vehicle was situated?

9  A    The vehicle was in the westbound travel lane on

10  East 26th Street, 26th and Wallace, and we had approached the

11  vehicle facing head on, so we actually pulled in front of the

12  vehicle into the westbound travel lane on East 26th Street.

13  Q    So, you were blocking off the vehicle on west -- excuse

14  me -- on East 26th Street to keep it from continuing to

15  travel forward?

16  A    Correct.

17  Q    Were any other marked units there present at the time?

18  A    Yes.  Officer Fuhrman and Officer Hill had initially

19  created the traffic stop at 26th and Wallace.

20  Q    And did you, as part of your responsibilities that

21  night, did you approach the vehicle?

22  A    Yes, I did.

23  Q    And what happened when you initially approached the

24  vehicle?  What was going on?

25  A    At that point in time, Officer Fuhrman and -- he was on

                    Smith - Direct              86

1  the passenger's side of the vehicle -- and I approached the

2  driver's side of the vehicle.

3  Q    And what was your purpose, first, for you approaching

4  the driver's side and Officer Fuhrman approaching the

5    passenger's side?

6    A    To make observations of all the occupants to insure

7    officer safety.

8    Q    And what happened or what steps were taken as part of

9    the traffic stop either to identify the occupants, or

10    whatever you do at a traffic stop?

11    A    Yes.  We identified the occupants of the vehicle.

12    Q    What did you discover about their identities or the

13    presence of identification on them?

14    A    The passenger was questioned for I.D.  At that point in

15    time, didn't have any.

16    Q    And were there two other passengers or were there other

17    passenger in the vehicle?

18    A    Yes.  There was a female driver and there was a male

19    passenger in the rear seat on the passenger's side.

20    Q    Did those -- were you able to -- was law enforcement

21    able to identify those two particular individuals?

22    A    I recall we identified the driver, and I don't recall as

23    to identifying the rear passenger at that time.

24    Q    You just don't know whether you did or not?

25    A    No, I don't.

1  Q   When you discovered that the driver -- the front seat

2  passenger, the defendant in this case, had not produced

3  identification, what was your initial response to that in

4  light of what you knew about the case?

5  A   At that point in time, knowing that he did not have any

6  ID and the information that we had gathered from EAGLE, based

7  on my experience, I thought it was a good idea to pull the

8  passenger out of the vehicle to conduct further

9  investigation.

10  Q   And did you relay what your concerns were to any other

11  officer?

12  A   Yes.  I informed Officer Fuhrman that, at that point in

13  time, we should remove the passenger out and have him step to

14  the rear of the vehicle.

15  Q   Okay.  Did Officer Fuhrman direct the defendant to get

16  out of the vehicle?

17  A   Yes, he did.

18  Q   And what did you observe after the defendant got out of

19  the vehicle as he was going towards the rear of the vehicle?

20  What were your observations?

21   A   At that point in time as Officer Fuhrman directed the

22   defendant to get out of the vehicle, he proceeded to the rear

23   of the vehicle.

24        At that point in time, the defendant stepped to

25   the -- it would be the rear quarter panel on the passenger's

                    Smith - Direct              88

1   side.  Officer Fuhrman instructed the defendant to put his

2   hands on the car.

3        As the defendant was reaching forward, a clear,

4   plastic baggie with suspected crack cocaine fell from his

5   upper torso area.

6   Q   And describe the baggie for Judge Cohill.  How well were

7   you able to see it and how quickly did it result in your

8   suspicion that it was crack cocaine?

9   A   As soon as I saw an object fall, I looked and I knew it

10   was crack cocaine.

11   Q   Had you seen crack cocaine previously in your experience

12   with the Erie Police Department?

13   A   Yes.

14   Q   And as far as the contents of the bag, did the contents

15  appear to be similar to other cases where you knew there to

16  be -- you discovered later there to be crack cocaine present?

17  A    Yes.

18  Q    And after the bag fell to the ground, did you take steps

19  to retrieve the bag?

20  A    Yes, I did.  I reached down and retrieved it.

21  Q    And did you then closely examine the bag?

22  A    As soon as it hit the ground, I knew it was cocaine.

23  But, yes, I did.

24  Q    And when you looked at it closely, did you further

25  confirm your suspicions that, at least without lab analysis,

                  Smith - Cross              89

1  it was crack cocaine?

2  A    Right.

3  Q    And at that point in time, was the defendant placed

4  under arrest?

5  A    At that point in time, we actually put his hands on the

6  vehicle and further -- a further search was conducted.

7  Q    And were additional quantities of crack cocaine baggie

8  and monies found on the defendant's person?

9  A    Yes.

10  Q    Now, in the course of the investigation itself, were you

11  advised by members of the Eagle Task Force that various

12  traffic violations had been observed?

13  A    Yes.

14  Q    In addition to that, were you told anything else about

15  the nature of the EAGLE Task Force investigation?

16  A    They had advised us that they were -- that they had been

17  watching these individuals concerning a drug investigation,

18  but they didn't go into detail.

19  Q    So, you were apprised that there were vehicle violations

20  and you knew that there was a drug investigation ongoing?

21  A    Yes.

22         MR. PICCININI:  That is all I have, Your Honor.

23                CROSS-EXAMINATION

24  BY MR. PATTON:

25  Q    Officer Smith, when you were first on patrol on the


                Smith - Cross              90


1  evening of March 2nd, 2005, and you got a call to try and

2  stop a white Cadillac, you did not know what the basis for

3  the stop was, correct?

4   A   That's correct.

5   Q   You just received a call from the dispatcher saying stop

6   this particular vehicle?

7   A   We got a call stating, as we normally do when they

8   request assistance to stop a vehicle for the Eagle Task

9   Force.

10   Q   You didn't know what the basis for the stop was though,

11   did you?

12   A   No, I didn't.

13   Q   When you got to 26th and Wallace, Officer Fuhrman and

14   his partner already had the white Cadillac stopped, correct?

15   A   They were there, that's correct.

16   Q   And Officer Fuhrman was already at the vehicle?

17   A   Yes.

18   Q   The white Cadillac?

19   A   They arrived, like, seconds before we did.

20   Q   So, you saw Officer Fuhrman approach the white Cadillac?

21   A   He was already at the vehicle.  They were out of the

22   vehicle approaching the vehicle prior to us.

23        I mean, it was a matter of seconds.  They were

24   there out of the vehicle approaching the vehicle.

25   Q   Okay.  Where did Officer Fuhrman go?

Smith - Cross                91

1    A    He went to the passenger's side.

2    Q    Where did his partner go?

3    A    I don't know.

4    Q    Where did you go?

5    A    I went to the driver's side.

6    Q    Where did your partner go?

7    A    I don't know.

8    Q    When you got to the driver's side of the vehicle, what

9    did you do?

10    A    I was making observations of the occupants.

11    Q    What did you do after you made observations of the

12    occupants?

13    A    That there was a question, the defendant was asked for

14    I.D. by Officer Fuhrman, and once he could not produce the

15    I.D., I instructed Officer Fuhrman that the defendant should

16    be pulled from the vehicle.

17    Q    This happened before Fuhrman ever went and talked with

18    anybody from EAGLE?

19    A    We were talking among one another during the whole

20  investigation.

21  Q    Well, did you ever see anybody from the Eagle Task

22  Force?

23  A    Yes.

24  Q    Where were they?

25  A    They were at the rear of the vehicle.

Smith - Cross                92

1  Q    Did you speak with them?

2  A    Yes.

3  Q    In relation to when you walked up to the driver's side

4  of the white Cadillac, looked in, when did you go and talk

5  with the Task Force guys at the rear of the vehicle?

6  A    They were standing at the rear of the vehicle just --

7  while I was watching them, we were conveying, talking to one

8  another about the investigation.

9  Q    What investigation?

10  A    Them asking us to stop the vehicle and why.

11  Q    Okay.  Which members of the EAGLE Task Force were you

12  speaking with?

13  A    It was -- I believe his name is Trooper Wagner.

14  Q    But, you are saying that you continued to stand by the

15  driver's side door of the car while you were having the

16  conversation?

17  A    Yes.

18  Q    With Trooper Wagner?

19  A    It's only six, seven feet --

20  Q    What did you?

21  A    -- from the driver's side to the rear of the vehicle.

22  So, I mean, I was watching the occupants.  I mean, I can

23  watch somebody and talk to somebody at the same time.

24  Q    The occupants of the vehicle, while you were talking

25  with the Task Force guys, you directed the people in the

Smith - Cross                93

1  vehicle to keep their hands where you could see them?

2  A    I believe at some point in time that was conveyed to

3  them.

4  Q    In fact, that would be something you would customarily

5  tell the people of the vehicle very shortly after you first

6  approached the car, correct?

7  A    Normally, yes.

8  Q    You tell the people in the vehicle to keep their hands

9  where you can observe them so that you can protect yourself?

10  A   Correct.

11  Q   And now did you ask anybody in the car for I.D.?

12  A   I believe I asked the driver for identification.

13  Q   The driver provided you with identification?

14  A   I don't recall.  I don't know if she had provided a

15  driver's license or anything of that nature.  She may have

16  just given me a name and I may have checked to see if it was

17  correct who she was.

18  Q   How would you do that checking?

19  A   Call my dispatcher.  Also, I knew the actual driver

20  because she used to be a cabbie.  So, I knew her actual face.

21  I seen her about town.

22  Q   Did you ask the rear seat passenger for I.D.?

23  A   No, I didn't.

24  Q   Do you know who did, if anybody?

25  A   I don't recall.


                        Smith - Cross                    94


1  Q   Did you hear Fuhrman ask the front seat passenger for

2  identification?

3  A   Yes.

4   Q   What was the answer?

5   A   Said he didn't have any.

6   Q   Did Fuhrman stay at the passenger's side door through

7   the course of the stop?

8   A   Until he asked the defendant to exit the vehicle.

9   Q   Okay.  And so from the time you were able to see Fuhrman

10  get out of his patrol vehicle and go to the passenger door on

11  the white Cadillac, Fuhrman stayed at the passenger side door

12  until Mr. Fleetwood was asked to get out of the vehicle?

13  A   As much as I can recall, yes.

14  Q   He never went back to the back of the car to talk with

15  the EAGLE Task Force guys?

16  A   I don't believe he did.

17  Q   And what was it that the EAGLE Task Force guys

18  specifically told you?

19  A   They had told us that they had been watching these

20  individuals and it was regarding a drug investigation and

21  they had left from a -- I don't recall what the address was,

22  where they had followed them from.

23  Q   Did they tell you that they wanted to talk to the

24  individuals in the car about their investigation?

25  A   I don't believe they indicated that to us at all.


Smith - Cross          95


1  Q   So, you have the people sitting in the vehicle with

2  their hands where you can see them, correct?

3  A   Correct.

4  Q   And then you have to check with the Task Force guys to

5  find out what the stop is about, correct?

6  A   They conveyed to us during the traffic stop what the

7  basis was -- the basis of the investigation that was going

8  on.

9  Q   Before that occurred, though, you didn't know why you

10  were stopping the white Cadillac?

11  A   Nope.  We were just assisting another agency.

12  Q   So, it's their -- you're just helping them out, correct?

13  A   Correct.  Usually, I mean, the basis is, when we stop a

14  vehicle for the Eagle Task Force, that some crime has

15  occurred.  I mean, that's obviously -- we wouldn't just stop

16  a vehicle for no reason at all.

17          I mean, we are going there on the basis that

18  believing that a crime has occurred.

19  Q   Well --

20  A   Can't just stop a vehicle if a crime hasn't occurred.

21  Q   Well, you didn't ask for an explanation from the EAGLE

22  guys before you stopped the white Cadillac as to what the

23  basis of the stop was, correct?

24  A   Well, it -- another police officer conveys to another

25  police officer that they needed a vehicle stopped.  So, we

Smith - Cross                96

1  are going on knowledge that they are believing that a crime

2  has taken place.

3  Q   But, you don't know what crime?

4  A   Correct.

5  Q   And when you were talking -- is it accurate to say when

6  you first approach a vehicle when you are doing a traffic

7  stop, that the first course of business is that you want to

8  get control of the situation?

9  A   Correct.

10  Q   And that was done in this case?

11  A   Correct.

12  Q   And you gained control of the situation by having you on

13  one side of the vehicle and Fuhrman on the other side of the

14  vehicle, correct?

15  A   Correct.

16  Q   And you had control of the situation by the people in

17  the vehicle being told stay in the vehicle and keep your

18  hands where we can see them, correct?

19  A   Correct.

20  Q   And you then, once you have that situation under

21  control, you start asking for identification, and things of

22  that nature, correct?

23  A   To further the investigation, correct.

24  Q   But, you don't even start the investigation or further

25  the investigation until you feel comfortable that you have

                    Smith - Cross              97

1   control over the situation?

2   A   Correct.

3   Q   And you determined, based on the facts as you found them

4   at the time of the stop, at the time of the stop, how best

5   you control the situation?

6   A   Correct.

7   Q   And in your case when you first did the stop, you and

8   Fuhrman decided, whether or not you conveyed this to one

9   another verbally, that the way to get control of the stop, to

10   protect yourselves and the other officers, was to have the

11   people in the vehicle keep their hands where you could see

12   them and stay in the vehicle?

13   A   Correct.

14   Q   So, after you guys do all that, which perhaps doesn't

15   take that long, but you get control of the situation, then

16   you ask for the I.D's, correct?

17   A   Correct.

18   Q   After you ask for the I.D's and found -- even find out

19   that the passenger doesn't have an I.D., you start talking

20   with the EAGLE guys about the details of what is going on

21   here?

22   A   When we approached the vehicle during the traffic stop

23   and I'm observing the occupants, this is all taking place at

24   once.  They are conveying to us what's going on.  I mean, it

25   doesn't have to be a step by step as you explained what we

                    Smith - Cross              98

1   are conducting.

2        While we were conducting the investigation, they

3   are speaking with us.  As I said, you know, I can watch the

4   occupants and I was talking to them at the same time.

5   Q    Once you found out that the EAGLE guys are investigating

6   a drug activity, that's when the decision is made we should

7   get the guy out of the car?

8   A    Once he could not produce any identification, that's

9   when I indicated to Officer Fuhrman that we should remove the

10  defendant from the vehicle.

11  Q    For what purpose?

12  A    Based on my experience, usually when an adult male

13  doesn't have any I.D., it's easier to -- first off, we want

14  to isolate him from the rest of the occupants.

15  Q    Because you didn't have an I.D.?

16  A    Well, based on the facts leading up to the situation

17  with them stating that a possible crime had been committed

18  and it's not illegal to remove an occupant from a vehicle

19  either.

20  Q    Why are you getting the guy out of the vehicle?

21  A    Based on my experience with, like I said, an adult male

22  not having any identification at that point in time leads me

23  to -- I'm thinking something is not right.  Why would he not

24  have identification?

25        Most normal individuals carry some type of photo


                  Smith - Cross            99


1  I.D. on them.  So, I believe that he was probably lying about

2  something.

3  Q   So, after you are told by the front seat passenger that

4  he doesn't have I.D., you decide that is an indication that a

5  crime is being committed and you need to get him out and

6  question him about that?

7  A   It is something leading up to the fact that, you know, a

8  crime had been committed.

9  Q   Was there something else that led you to believe that a

10  crime had been committed?

11  A   Well, the fact that the EAGLE Task Force had indicated

12  that they were investigating him for possible drugs so --

13  Q   Well, did they give you any of the details of their

14  investigation?

15  A   No.

16  Q   All you knew is, these Eagle guys, what they do is

17  investigate drugs?

18  A   For the most part, yes.

19  Q    And if the EAGLE guys want them and if they are doing

20  some investigation, it's a drug investigation?

21  A    More than likely.

22  Q    And so now you are saying it's a combination of, that

23  there is a drug investigation by the EAGLE guys and the

24  passenger doesn't have an I.D. so that leads you to suspect

25  that a crime may have occurred?


                    Smith - Cross                100


1   A    They had already told us, like I said, that there was --

2   they were investigating these guys for drugs and he didn't

3   have any I.D. on him.  And at that point in time, I decided

4   that it would be better to isolate him from the rest of the

5   occupants to further the investigation.

6           So, I instructed Officer Fuhrman to remove him from

7   the vehicle.

8   Q    So, you were doing this to further your investigation

9   into the crimes you think have been committed?

10  A    Correct.

11  Q    And that is why you decided to get, who turned out to be

12  Mr. Fleetwood, out of the vehicle?

13  A    Correct.

14  Q    And the reason you think a crime may have been committed

15  was because EAGLE had asked you guys to stop them, and Eagle

16  wouldn't ask you to stop them if they didn't believe a crime

17  had been committed, correct?

18  A    Correct.

19  Q    And he didn't have I.D., correct?

20  A    Yes.

21  Q    And based on those two combinations of factors, you

22  decided, hey, to further the investigation, we should, as you

23  say, isolate Mr. Fleetwood from the other two people in the

24  car?

25  A    Correct.

                    Smith - Cross                 101

1  Q    So, you can question him about whether he did, in fact,

2  commit a crime?

3  A    Well, it didn't even get to that point.

4  Q    But, that is what you were planning on doing?

5  A    Correct; just questioning him; talk to him.

6  Q    And you wanted him separate from the other two people so

7  that the other two people can't hear what you are asking

8  Mr. Fleetwood and what he is saying?

9  A   Right.  So, they can't cooperate with one another.

10  Q   You want him separate because, as part of your

11  investigation, if it would have gotten to that point, ask

12  Mr. Fleetwood questions, correct?

13  A   Correct.

14  Q   Without the other two people in the car hearing the

15  answers?

16  A   Correct.

17  Q   So, that you can then go and talk with the other two

18  people in the car separately and check their answers against

19  Mr. Fleetwood's answers?

20  A   If that's what it led to.

21  Q   That's what you were planing to do absent -- but once

22  the crack fell out, it didn't even have to get to that point?

23  A   Correct.

24       MR. PATTON:  Those are my questions, Your Honor.

25              REDIRECT EXAMINATION


              Smith - Redirect              102


1  BY MR. PICCININI:

2  Q   Officer Smith, these situations, do counsel's questions

3  presume one step to another step to another step, do they all

4  happen at sequence there at ten-fifteen at night?

5  A    Never.

6  Q    Would it be more accurate to say that this entire thing

7  with the defendant was a more fluid thing throughout the

8  encounter you had with him?

9  A    Throughout the experience --

10  Q    If you need a glass of water, there is water up there.

11  A    Just with the experience, you deal with the situations

12  as they arise from the initial conducting the traffic stop to

13  how you are questioning, positioning yourself, speaking with

14  other officers on scene.

15  Q    When you initially became concerned and indicated that

16  this defendant needed to be removed from the vehicle, that

17  was your own concern and you expressed that to other

18  officers?

19  A    Yes.

20  Q    During that same mingling of information from all the

21  officers, did there then become a collective decision by the

22  Eagle guys, the Erie Police guys and you, that taking and

23  removing Mr. Fleetwood from the vehicle was the right thing

24   to do in the situation?

25   A   Yes.  Because I had looked at Officer Fuhrman and I

                    Smith - Redirect                103

1   said, pull him from the vehicle.  I said, get him out of the

2   car.  And Officer Fuhrman agreed and so did Trooper Wagner.

3   Q   So, you all agreed?

4   A   Yes.

5   Q   Was this one officer directing the others to do it?

6        Was it the EAGLE Task Force ordering the Bureau of

7   Police to do it, or was it a collective decision based on all

8   of your years of experience that this man in this location

9   without identification needed to be removed from the vehicle?

10   A   I initiated the pull from the vehicle and then all three

11   off us, like, okay, pull him from the car.

12   Q   And as far as the crime that was being committed, when

13   you are requested on behalf of another law enforcement

14   officer to conduct a traffic stop, are you accepting the

15   knowledge that the other individuals have in order to support

16   your decision to make the traffic stop?

17   A   Yes.

18   Q   It is not your job to second guess the --

19  A    No.  I'm going on information based on that another

20  agency is requesting my assistance and that a crime has been

21  committed.

22  Q    And you said, although counsel kept asking you to say

23  yes or no to the ways in which he wanted to characterize the

24  questioning, you said you just wanted to get the guy out of

25  the car and talk to him?


                    Smith - Redirect              104


1   A    Yes.

2   Q    What was your purpose in doing that?

3   A    For the investigation.  Based on the fact that he didn't

4   have any I.D., I want to find out who this guy is, if he is

5   who he is saying he is, which he actually wasn't.

6   Q    So, one of the things you want to figure out is, is the

7   guy who he says he is?

8   A    Right.

9   Q    And why is that important from a law enforcement

10  standpoint in this investigation in light of the

11  investigation?  Why is that important?

12  A    Well, it could be a known criminal and there could be

13  other mitigating circumstances based on who he actually is.

14  Q    But, would you know that without being able to identify

15  him?

16  A    No.

17  Q    And is that why it is a concern, in light of all the

18  factors that he is being removed from the vehicle, first of

19  all, just to figure out who is?

20  A    Correct.

21  Q    Now, is it also part of it that there is an

22  investigation ongoing into the fact that he could be a drug

23  dealer?

24  A    Right.

25  Q    Did that also play a part in it?

105

1  A    Yes, it did.  Yes, it did.

2       MR. PICCININI:  That is all I have, Judge.

3            RECROSS-EXAMINATION

4  BY MR. PATTON:

5  Q    You didn't want him to get out of the car so you could

6  ask him about traffic violations, is that correct?

7  A    No.

8  Q   It is correct that you didn't want to talk to him about

9  that?

10  A   He wasn't driving so I wouldn't ask him about the

11  traffic violations.

12  Q   So, you are asking him to get out of the car to further

13  the EAGLE investigation on drugs?

14  A   Correct.

15       MR. PATTON:  Thank you.

16       THE COURT:  Thanks, officer.

17  (The witness was excused.)

18       MR. PICCININI:  Your Honor, just one matter of

19  clarification.

20       In the defendant's motion, he has challenged the

21  remainder of the statements made by the defendant as being

22  the fruits of what we have already heard testimony about, but

23  he is not separately challenging the random warnings or the

24  questioning itself.  He is just indicating that everything

25  that flowed from this area was incorrect.

106

1       And if that is accurate, then we have no other

2  witnesses.

3      MR. PATTON:  That is an accurate characterization

4  of our argument, Your Honor.

5      THE COURT:  And we haven't heard anything from

6  Trooper Wagner?

7      MR. PICCININI:  I believe counsel has another

8  witness to call, and Trooper Wagner is taking those steps

9  concerning the notes.

10     THE COURT:  So, you have a witness, too?

11     MR. PATTON:  Yes.

12     Your Honor, we call Adrianna Havelka.

13     THE COURT:  Would you come forward and be sworn,

14  please?

15     THE CLERK:  Raise your right hand.

16          * * * * *

17     ADRIANNA HAVELKA, having first been duly sworn,

18  testified as follows:

19     THE COURT:  Would you have a seat up here, please,

20  give us your name and spell your last name.

21     Would you give us your name?

22     THE WITNESS:  Adrianna Havelka.

23     THE COURT:  Will you spell both your first name and

24   last name?

25        THE WITNESS:  A-d-r-i-a-n-n-a, H-a-v-e-l-k-a.


            Havelka - Direct            107


1        DIRECT EXAMINATION

2   BY MR. PATTON:

3   Q   Miss Havelka, what do you do for a living?

4   A   I'm working for the Erie Transportation Company.  I'm a

5   cab driver.

6   Q   And how long have you worked as a cab driver?

7   A   Ten years.

8   Q   In addition to working as a cab driver, do you also

9   sometimes hire yourself out as what I'll refer to as a

10   jittney driver driving people in cars other than your taxi

11   cab?

12   A   Yes.

13   Q   I want to ask you some questions about events that

14   occurred on the evening of March 2nd, 2005.

15   A   Okay.

16   Q   On that evening, did you give a ride to Mr. Fleetwood?

17   A   Yes.

18  Q   Had you met Mr. Fleetwood before that date?

19  A   On that night?

20  Q   No.  Just at any time prior to March 2nd, 2005, had you

21  met Mr. Fleetwood before?

22  A   Yes.

23  Q   And how had that happened?

24  A   He was my request call.  My client.  He wanted a cab.

25  Q   Had you driven him in your cab before?


                    Havelka - Direct                108


1  A   Yes.

2  Q   And so did you have a situation where Mr. Fleetwood

3  would sometimes call and request that you give him rides?

4  A   All the time.

5  Q   Did that happen on March 2nd of 2005?

6  A   Yes.

7  Q   Sometime on that day, did he call and request that you

8  give him a ride?

9  A   Yes.

10  Q   About what time of day was that?

11  A   He called me, like, nine-thirty nighttime.

12  Q   And did he ask you to give him a ride somewhere?

13   A   Yes.

14   Q   Were you supposed to meet him somewhere?

15   A   I supposed to meet him, like, in ten, fifteen minutes at

16   12th and Parade, Country Fair.

17   Q   The Country Fair gas station there?

18   A   Yes.

19   Q   That's on the corner of 12th Street and Parade Street

20   here in Erie?

21   A   Yes.

22   Q   Did you agree to do that?

23   A   Yes.

24   Q   Did you go to the Country Fair at 12th and Parade?

25   A   Yes, I go.


                    Havelka - Direct              109


1   Q   Did you ultimately end up meeting Mr. Fleetwood there at

2   12th and Parade?

3   A   No.

4   Q   What happened?

5   A   I was going inside to buy me something and then I saw

6   he's not coming, and I called him back and then he told me to

7   go on 14th Street.

8   Q   Do you recall where on 14th Street?

9   A   400 block.  I think it was 448 East 14th.

10  Q   Did you then go to that location?

11  A   Yes.

12  Q   How far away from Country Fair is that?

13  A   Like, probably thirty seconds, a minute away.

14  Q   When you got to the area of this 448 East 14th Street,

15  what happened?

16  A   I called him again and I let him know I'm outside.

17  Q   Did he come outside?

18  A   Yeah.  He come after, like, maybe five, ten minutes.

19  Q   After he came outside, did you drive him somewhere?

20  A   Yes.

21  Q   Where did you drive him?

22  A   He told me to go on June Street.

23  Q   Did you know where June Street was?

24  A   Yes.

25  Q   Did you, in fact, then drive him to June Street?


                    Havelka - Direct                110


1   A   Yes.

2  Q   When you were driving to get him to June Street, did you

3  travel east on Buffalo Road?

4  A   Yes.

5  Q   Did you turn onto Downing Street off Buffalo Road?

6  A   I turned right on Downing and then left on the first

7  street, which is Prospect, and I go east on Prospect and I

8  turn another right on June Street.

9  Q   So, as you were traveling east on Buffalo Road, you came

10  to the intersection of East Avenue and Downing Street, is

11  that correct?

12  A   No.  It's -- it's Buffalo and Downing.

13  Q   Excuse me.  Buffalo Road?

14  A   Yes.

15  Q   And then you turned onto Downing?

16  A   I turned right on Downing and then I turned left on

17  Prospect.

18  Q   When you turned on Downing, once you started turning on

19  Downing, stop turning on Downing and then turn on Buffalo

20  Road?

21  A   I am not understanding what you are saying.

22  Q   At any point, did you start to turn onto Downing Road,

23  but then change your mind and decide you are not going to

24  stay on Downing Road and basically do an U-turn and get back

25  on Buffalo Road?

Havelka - Direct            111

1  A   No.

2  Q   So, you turned right onto Downing?

3  A   Yes.

4  Q   And then did you travel -- I guess if you turned right,

5  if you were going east, that would be going south?

6  A   South on Downing.  A block south on Downing.

7  Q   Until you got to what street?

8  A   I turned left on Prospect going west.  East.

9  Q   And when you went east on Prospect, did that take you to

10  June Street?

11  A   Yes.

12  Q   And when you got to June Street, what did you do?

13  A   I turned right on June before Fairmont, and I just stop

14  because he was going in a house over there.

15  Q   When you were driving on Buffalo Road, did you believe

16  you obeyed the traffic signals that were there on Buffalo

17  Road?

18          Like, if you came to a red light, did you stop at

19  the red light?

20  A   Yes.  On Downing, it's a light.

21  Q   Are there some other lights on Buffalo Road that you

22  went through before you even got to Downing?

23  A   Yes.  Probably four lights.

24  Q   About four lights?

25  A   Yeah.

Havelka - Direct              112

1  Q   Do you believe you properly obeyed the traffic signals

2  at those lights?

3  A   Yes.

4  Q   If it was red, did you stop?

5  A   Sure.

6  Q   If it was green, you went?

7  A   Yes.

8  Q   Do you believe --

9  A   But, on Buffalo and Downing, because I was turning

10  right, is not sign.  I can turn right if it's a red light.

11  Q   Okay.  Is one of the roads that you went through as you

12   were traveling east on Buffalo Road, did you cross East

13   Avenue?

14   A   No.  Yes.  Sorry.

15   Q   And is there a light there at Buffalo Road and East

16   Avenue?

17   A   Actually, that is 18th and East Avenue and then 18th

18   Street became Buffalo.

19   Q   So, 18th Street, at some point, just turns into Buffalo

20   Road, is that correct?

21   A   Yes.

22   Q   But, I guess where East intersects with 18th Street,

23   it's still 18th Street, not Buffalo yet?

24   A   Yes.

25   Q   Is there a light there at 18th Street and East Avenue?

Havelka - Direct            113

1   A   Yes.

2   Q   And to the best of your memory, did you comply with the

3   light there?

4   A   Sure.

5   Q   Are you able, as you sit here today, to remember exactly

6   every detail of what happened at the intersection of East and

7  18th Street?

8  A    Yes.

9  Q    You think you stopped at that --

10        Well, do you recall that the light there was red or

11  green when you first approached?

12  A    It was green.

13  Q    And you just went through it?

14  A    Yes.

15  Q    And that is 18th Street and East Avenue, it is not

16  Buffalo Road, correct?

17  A    No.

18  Q    When does 18th Street switch to Buffalo Road?

19  A    Right after East Avenue.

20  Q    Okay.  It's 18th until you get to East Avenue, and then

21  once you get east of East Avenue, it turns to Buffalo Road?

22  A    Yes.

23  Q    Now, when you went to Country Fair where you were

24  originally supposed to meet Mr. Fleetwood, I believe you

25  testified you didn't end up meeting him there?

Havelka - Direct          114

1   A   No.

2   Q   But, once he said that -- you called him from there?

3   A   Yes.

4   Q   And you eventually went to the 14th Street address to

5   pick him up, correct?

6   A   Yes.

7   Q   Was there some lapse in time between when you first went

8   to Country Fair and when you finally ended up going to the

9   14th Street address?

10   A   No.

11   Q   And what was the weather like that day?

12   A   It was cold and then also was very slippery.

13       MR. PATTON:  Judge, I would like to show

14   Miss Havelka what I marked as Defendant's Exhibit A.  It's a

15   videotape from a security camera at the Country Fair gas

16   station at 12th and Parade.

17       I would introduce it through Mr. Townley to lay the

18   foundation for it, but I would like her to be able to view

19   it.

20       MR. PICCININI:  Your Honor, I would request, in

21   light of the fact that we have asked Trooper Wagner to leave

22   the courtroom in order to go get those notes, that we hold on

23  because he is going to be called as a rebuttal witness, and

24  without having the opportunity to review the tape, would have

25  to review the tape a second time.


                    Havelka - Direct              115


1          He is across the street at the Eagle Task Force

2  office and I request that he come over at this time.

3          THE COURT:  Why don't you go ahead and do your

4  examination?

5          Is that to show the picture of the license plate?

6  Is that what it is for?

7          MR. PATTON:  Yes.  Do show the car.  You can't see

8  exactly the license plate, but it is to show the car.

9          MR. PICCININI:  I thought it was the direction of

10  the car?

11          MR. PATTON:  No.  This is a different one.

12          MR. PICCININI:  Okay.

13  BY MR. PATTON:

14  Q    Miss Havelka, I am going to ask you to watch the

15  left-hand portion of your screen and see if you can identify

16  a vehicle that comes in from that side of the screen.

17          Do you see that vehicle that just came in from the

18   left and pulled up?

19   A   Yes.

20   Q   Facing the camera?

21   A   Yes.

22   Q   Can you identify that vehicle?

23   A   That is the car.  I mean --

24   Q   Whose car is that?

25   A   This is my ex-husband's car.


                 Havelka - Direct              116


1   Q   And have you seen this tape before today in my office?

2   A   Yes.

3          THE COURT:  Does this purport to be the same date

4   of the arrest, because this says March 20th and the arrest

5   is --

6          MR. PATTON:  Your Honor, Mr. Townley will explain

7   this.

8          If you look on the bottom right of this screen, you

9   will see that it says 02 M-a-r 05.

10          THE COURT:  Sort of a misprint.

11          MR. PATTON:  Right.  And then the time is above

12  that.

13  BY MR. PATTON:

14  Q   Miss Havelka, did you see the individual just get out of

15  the white vehicle that's in the middle of the screen?

16  A   Yes.  That was me.

17  Q   That was you?

18  A   Yes.

19      MR. PATTON:  Your Honor, the date and time that's

20  up on the left-hand corner, it's something to do with Country

21  Fair's stuff --

22      THE COURT:  Okay.

23      MR. PATTON:  -- that Mr. Townley will explain.

24  But, it is the lower right-hand corner that has the date and

25  the time on it.

Havelka - Direct              117

1  BY MR. PATTON:

2  Q   And, Miss Havelka, viewing this videotape, is that you

3  coming in Country Fair on the night that you gave

4  Mr. Fleetwood the ride from East 14th Street to June Street

5  and then when you were ultimately stopped on 26th and

6  Wallace?

7  A   Yes.

8  Q   Is this videotape accurately depicting the state of your

9  car on that evening?

10  A   Yes.

11      MR. PATTON:  Judge, if I can fast forward this a

12  little bit until she comes out and then leaves.

13  Q   Miss Havelka, did you see, even though it was kind of

14  fast forwarding, did you see the individual come out of the

15  store and get into the car?

16  A   Yes.  It's me.

17  Q   And then what happens?  Was that the vehicle pulling out

18  of the parking lot?

19      Was that you backing out of the parking spot and

20  then driving out of the parking lot?

21  A   Yes.

22      MR. PATTON:  This thing doesn't have a pause on it.

23      THE CLERK:  I may have one.  Try it again.  I'll

24  try it.  Is that the beginning?

25      MR. PATTON:  It doesn't have a pause on it.

Havelka - Direct          118

1       THE CLERK:  This one has one.  My controls have a

2   pause.

3       MR. PATTON:  Does it?

4       THE CLERK:  Yes.

5       MR. PATTON:  Can you pause?

6       THE CLERK:  Yes.

7   (Off the record discussion.)

8       THE CLERK:  You tell me when you would like to

9   pause.

10       MR. PATTON:  Try and pause it there.

11       That is okay.  We've seen it.

12   BY MR. PATTON:

13   Q   Miss Havelka, I would like to show you what I have

14   marked as Defendant's Exhibit C and ask you to take a look at

15   that, if you could, please.

16       Is that your ex-husband's vehicle?

17   A   Yes.

18   Q   Is that the same vehicle that we just saw on the

19   videotape?

20   A   Yes.

21   Q   And the same vehicle that you used to give Mr. Fleetwood

22  a ride on March 2nd, 2005?

23  A   Yes.

24       MR. PATTON:  And, Judge, I'll introduce it through

25  Mr. Townley.  He is the one that took the picture.


Havelka - Direct                    119


1   Q   Miss Havelka, if the date or the time on the video shows

2   this to be roughly nine o'clock on the evening of March 2nd,

3   2005, and the officers testified that you did not show up at

4   East 14th Street until maybe about a quarter until ten, a

5   little before ten o'clock, could you explain why there would

6   be some lapse of time?

7   A   Because this is the first time when I went to the

8   Country Fair to buy some bread and other things for my

9   ex-husband.  So, I go back to his house.

10       And then when Mr. Fleetwood call me on my phone, I

11  was over my ex-husband's house.  So, then after I left my

12  ex-husband's house, I go to -- again to Country Fair, but I

13  parked on the other side of the stall.

14  Q   So, you went to the Country Fair the first time but

15  Mr. Fleetwood was not ready for you to pick him up?

16  A   Correct.

17  Q    And then you went to your ex-husband's house?

18  A    Yes.

19  Q    Where does he live?

20  A    409 East 11th.

21  Q    And then you went from your ex-husband's house to then

22  pick up Mr. Fleetwood subsequent to when this video was

23  taken?

24  A    Yes.

25  Q    Now, Miss Havelka, I would like to ask you some

                    Havelka - Direct                120

1  questions --

2        MR. PATTON:  Rich, you can turn that off.

3  Q    I want to ask you some questions about what occurred

4  when you actually were stopped by the police on the evening

5  of March 2nd, 2005.  Okay?

6        Where were you when police officers actually did a

7  traffic stop on your car?

8  A    I was sitting at a light, 26th and Wallace.

9  Q    When you say you were sitting at the light, did you have

10  a red light?

11  A   Yes.

12  Q   And how did the police cars approach you?

13  A   I was waiting the light to change.  And when the light

14  change, I see the police car on Wallace Street.  So, they

15  have trouble going up on Wallace because the road was so

16  slippery.

17      So, the police turned the lights on.  So, I know if

18  I have a green light to go, I have to wait for them to go

19  first because probably they have an emergency.

20  Q   When you say they put their lights on, you mean their

21  overhead flashing lights?

22  A   Yes.

23  Q   Was the police car actually finally at some point able

24  to get traction and move forward?

25  A   Yes.  And they turn left on 26th Street and just come in

                    Havelka - Direct              121

1  front of my car.

2  Q   What happened after that?

3  A   Just the police officer come out of the car and they

4  said they want to see our hands, to put our hands up or

5  something.

6   Q   Did you do that?

7   A   Sure.

8   Q   Did Mr. Fleetwood do that?

9   A   Yes.

10  Q   After they asked you to put your hands up, what happened

11  after that?

12  A   Well, he come to the window and asked me for license and

13  registration and insurance.

14  Q   When you say "he," who do you mean?

15  A   One of the police officers who come to -- who come at my

16  window.

17  Q   Did you give him your license?

18  A   Yes.

19  Q   What happened after that?

20  A   Then he go to the other side and asked me to start --

21  and asked Mr. Fleetwood for identification, and he don't have

22  one.  So, he go to the other window in back of my seat was

23  another person.  So, they asking for I.D. and then he give to

24  them the I.D.

25  Q   Was there just one policeman there?

Havelka - Direct          122

1   A    No.  Two.  One was making sure nobody move in the car,

2   or something.  I don't know.

3   Q    There was more than one police officer there?

4   A    Yes.

5   Q    After they got identification -- or found out that

6   Mr. Fleetwood did not have identification, what happened?

7   A    Well, they wait for, I don't know what unit to come, so

8   then they took Mr. Fleetwood out of the car and the other guy

9   out of the car.

10   Q    From the time that the police officers first walked up

11   to the car and said show us your hands, did you do that up

12   until the time they told you it was okay not to?

13   A    Yeah, I do that.

14   Q    Did Mr. Fleetwood do that up until the time they told

15   him to get out of the car?

16   A    Yes.

17   Q    About how much time passed, roughly, if you can

18   estimate, between when they come up and told you to put your

19   hands up until when Mr. Fleetwood was asked to get out of the

20   car?

21   A    A few minutes; probably between five and ten minutes.

22  Q   Are you sure it was -- the same police officer who asked

23  you for I.D. was the same guy that asked Mr. Fleetwood for

24  I.D., or do you know?

25  A   I think it was the same guy, same police officer.  I'm

                    Havelka - Cross                123

1  not sure, though.

2  Q   Okay.  If I didn't ask this, Defendant's Exhibit's C,

3  the photo that you identified as your car, does that fairly

4  and accurately depict the back end of your vehicle or the

5  back end of your husband's vehicle?

6  A   Can you repeat that?

7  Q   Does the picture, Defendant's Exhibit C that I showed

8  you, does that -- is that an accurate photo of the back end

9  of your ex-husband's car?

10  A   Yes.

11  Q   Okay.

12        MR. PATTON:  I have no further questions, Your

13  Honor.

14        THE COURT:  Mr. Piccinini.

15              CROSS-EXAMINATION

16  BY MR. PICCININI:

17  Q    Ma'am, you would agree with me that this isn't a photo

18  of your husband's car on March 2nd, 2005, is it?

19  A    Yes.

20  Q    This is a picture of it on March 2nd, 2005?

21       This is what it looked like -- this is the car --

22  the picture taken on March 2nd, 2005, the night you were

23  stopped by the police?

24  A    No.

25  Q    And it was taken sometime afterward?

                    Havelka - Cross            124


1   A    Yes.

2   Q    No snow on the ground?  No snow on the car?

3   A    No.

4   Q    And how long have you been employed by Kenneth

5   Fleetwood?  How long have you been working for him?

6   A    I am not employed by him.  I'm employed with Yellow Cab.

7   Q    How long has Mr. Fleetwood been paying you for private

8   rides around the City of Erie?

9   A    Any time when he need a cab.  He was calling me.

10  Q    And isn't it true that when these private rides take

11  place that you don't maintain any records of the trip itself,

12  do you?

13  A   Not many times I give rides in my personal car.

14  Q   But, with Mr. Fleetwood you do give rides in your

15  personal car?

16  A   Yes.  He call me because he was calling the cab company

17  that night and they were -- because the wait, they were

18  behind, like, two hours.

19       So, then he said if I can -- I wasn't working in

20  that time.  It was nighttime.  So, he asked me if I can go to

21  give him to -- a ride and I said yes.

22  Q   But, this wasn't the first time that you gave him a ride

23  in your personal car, was it?

24  A   Yes, it was.

25  Q   This night was the first night you ever had this

Havelka - Cross              125

1  defendant in your personal vehicle, in the Cadillac, is that

2  your testimony under oath?

3  A   Yes.

4  Q   Okay.  And on this particular night, he didn't call the

5    dispatch and have the dispatch at the Erie Cab Company call

6    you, did he?

7    A    Oh, no.

8    Q    He called you directly, didn't he?

9    A    Yes.  It's a, like, being a contract driver.  You have

10   your people who call you all the time.  They don't have to

11   call the company.  That's why we carry a cellphone, like, the

12   people to call us on the phone.  We are self-employed so

13   there is nothing wrong if they call us on the phone.

14   Q    So, you are self-employed?

15   A    Yes.

16   Q    And one of the people who employ you in the use of your

17   vehicle is Mr. Fleetwood?

18   A    Can you repeat that?

19   Q    One of the people who employ you, who pay you for the

20   use of your vehicle to transport them, is Mr. Fleetwood?

21   A    I just want you to keep in mind, I am not employed --

22   Q    Ma'am --

23        MR. PATTON:  Judge, can the witness finish her

24   answer?

25        THE COURT:  Let her answer.

1        THE WITNESS:  I'm not his employee.  He just call

2   me for a ride.  He could have called another -- we are, like,

3   with five cab drivers.  He could call anybody, not just me.

4   Q    But, he called you and he had your personal cellphone

5   number?

6   A    Yes.  Because he like the way that I keep my car.  My

7   car, it's an almost new car, new cab, and it's always clean

8   and it smell good.

9        So, I have, like, sixty people who call me, like a

10  request call.

11  Q    What car are you referring to?

12  A    I'm driving a 1999 Cadillac, like a cab.

13  Q    And is this the Cadillac that you are talking about?

14  A    No.  That is the -- it's a personal car.

15  Q    Since you are self-employed, the Erie Cab Company

16  doesn't keep any records of how much Mr. Fleetwood pays you

17  for the trips that you take him on?

18  A    Yes.  I have on the paper what I -- all the time when I

19  am working on the contract with my cab, all the calls are on

20  the paper.

21          So, probably I wasn't charged him that night maybe

22    just for doing him a favor.

23    Q    Why were you doing him a favor?  Who was he to you?

24    A    He's nobody.

25    Q    And you agree with me that this isn't the first time

                    Havelka - Cross            127

1    that you travelled with this defendant to East 14th Street,

2    is it?

3          This isn't the first time you took him to East 14th

4    Street, is it?

5    A    I don't say that.  I pick him up many times from

6    East 14th Street.

7    Q    Okay.  And on how many occasions?  How regularly did he

8    call you personally to come pick him up in the vicinity of

9    East 14th Street?

10   A    At least once a day.

11   Q    At least once a day.

12         And you were familiar not with just East 14th

13   Street but, as you testified, you knew the specific address,

14   448 East 14th Street?

15   A    Yes

16  Q   And once a day, this defendant would have you pick him

17  up there, is that correct?

18  A   Yeah; sometimes two times.

19  Q   Okay.  And you are also familiar with the location on

20  June Street where this defendant would go to, aren't you?

21  A   Not really.

22  Q   Was this the only time you had ever been to 2125 June

23  Street in that vicinity?

24  A   Oh, no.

25  Q   And you had been there from East 14th Street to

Havelka - Cross              128

1  June Street with this defendant on several other occasions?

2  A   Yes.

3  Q   And on those several other occasions, can you indicate

4  to me what conversations the defendant had with you with

5  regard to what he was doing on East 14th Street or

6  June Street?

7  A   No.  He when he come in the car, he just told me where

8  to go.  So, he is not a much talker.  He don't talk too much.

9  Q   How much does he pay you for these trips?

10  A   He don't pay me nothing.

11  Q   He doesn't pay you anything?

12  A   No.

13  Q   Why are you giving him -- why where you giving him rides

14  to East 14th Street and June Street?

15  A   I just said maybe I was asking for the money for the

16  gas, but I don't have the chance because the police stop me

17  and arrest him.

18  Q   On other occasions, how much does he pay you for the

19  trip?

20  A   Whatever the meter is.

21  Q   Has he ever paid you in drugs?

22  A   No.

23  Q   Have you ever seen him with crack cocaine in his

24  possession there in the vehicle?

25  A   No.


                    Havelka - Cross              129


1  Q   Now, when you first testified you said that on this

2  night, March 2nd, he called you around nine-thirty.

3        Is that your testimony?

4  A   Yes.

5   Q   And that you then immediately went over to the Country

6   Fair at 12th and Parade?

7   A   Yes.

8   Q   And when you called him, he wasn't there yet, was he?

9   A   No, he wasn't.

10   Q   And you indicated that when you called him, he indicated

11   that he wasn't there, but that he wanted you to meet over at

12   448 East 14th Street, isn't that correct?

13   A   All right.

14   Q   And you also testified that it's a really short trip

15   from there to the East 14th Street address, is that also

16   correct?  It is not a long trip?

17   A   No, it is not.

18   Q   So, you went directly after the call from there over to

19   East 14th Street because that's where he would be?

20   A   Yes.

21   Q   And that in just a matter of minutes, you waited out

22   front and he came out?

23   A   Yes.

24   Q   Is that your testimony?

25   A   Yes.

Havelka - Cross            130

1  Q    Then how can it be then that it is almost forty-five

2  minutes later that your vehicle is observed picking up the

3  defendant?

4        How many times did you go to East 14th Street that

5  night?

6  A    Once.

7  Q    Then how can it be that you are claiming that at

8  nine-thirty, he called you, you immediately went to the

9  Country Fair, called him, you then immediately went over to

10  the East 14th Street address?

11  A    If you refer, like, seeing my car at the Country Fair,

12  that was -- I just said that was the first time when I went

13  to Country Fair.

14  Q    So, this tape shows you at Country Fair a second time?

15  A    First time.

16  Q    Does it show you a second time?

17  A    No.

18  Q    Why?

19  A    Probably because the camera don't catch me being parked

20  in the corner of the -- to the other side of the parking lot.

21  Q   Okay.  Could it be that you weren't there?

22  A   Yes, I was.

23  Q   And what time were you there?

24  A   Maybe twenty to ten.

25  Q   You were there -- wait a second.

Havelka - Cross          131

1       At nine-thirty, you get the call.  You say that

2   when you get there, he is not there.  You call him

3   immediately and he sends you over to East 14th Street?

4   A   Yeah.  But, I also -- I said I told Mr. Fleetwood when

5   he called me at nine-thirty, I am going to be there at -- to

6   be there in ten, fifteen minutes.

7   Q   Okay.  You were there in ten, fifteen minutes, you

8   called him and you immediately went over to East 14th Street?

9   A   Exactly.

10  Q   Wait a second.  Either you did go over to East 14th

11  Street or, as you testified earlier, you went over to your

12  ex-husband's house.  Which is it?

13  A   I just said when I went back to my ex-husband's house

14  was the first time when I went to the Country Fair.

15  Q   Who owns the vehicle that you were driving?

16  A   My ex-husband.

17  Q   And why do you have the vehicle?

18  A   Because he let me use it for a few days when my car was

19  broke down.

20  Q   Okay.  Your car was broke down?  Which car?

21  A   My -- not the Cadillac.  My other car.

22  Q   How many of Mr. Fleetwood's friends has he introduced

23  you to from Cleveland?

24  A   He don't introduce me to nobody.

25  Q   How many other people who you know from Cleveland who

                    Havelka - Cross              132

1  are friends with Mr. Fleetwood do you drive around the City

2  of Erie in your personal vehicle or that you are on call for?

3  A   I don't drive them in my personal car.  I drive them in

4  my cab.

5  Q   Who are they?

6  A   Whoever call me.

7  Q   Are they friends of Mr. Fleetwood?

8  A   I don't know if they are his friends.  Sometimes he's

9  with a person or two person.  I never ask who is this person

10   to you.

11   Q    But, you know him personally by Mr. Fleetwood.

12         What are the names of the other people that you

13   regularly drive around the City of Erie who are affiliated

14   with Mr. Fleetwood?

15   A    Oh, before all this happened, I don't even know

16   Mr. Fleetwood's last name.  I know him as

17   Boo.(Spelled Phonetically).

18   Q    You knew him as Boo?

19   A    Yes.

20   Q    And how long have you known Boo and how long have you

21   been giving him trips?

22   A    A year and a half.

23   Q    You were transporting him over to East 14th Street for a

24   year and a half?

25   A    No.  No.

Havelka - Cross            133

1    Q    You said he would call you every day?

2    A    Almost every day when he was in town.

3    Q    Almost every day you would be the person to personally

4   take him over to the East 14th Street address, is that

5   correct?

6   A   Take him from where?

7   Q   Take him from East 14th Street to some other location.

8   A   Yes.  Oh, yes.  We used to go to grocery shop, to the

9   malls, to the people's house, or sometimes he just call me to

10  pick up somebody for him to take them in, like, a companion

11  person take them to 14th Street.  He's not necessarily to be

12  in the cab.  He can just call me to just pick up somebody for

13  him, or things like that.

14  Q   Okay.  Earlier today, a Pennsylvania State Police

15  trooper testified that he actually -- that he was driving

16  behind your vehicle on March 2nd, 2005, that he followed you,

17  at all times followed you from when you left East 14th Street

18  up along Buffalo Road.

19        And you have already testified that you agreed that

20  it was snowy out and that it was slippery, is that correct?

21  A   I don't say it was snowing.  I said the roads was

22  slippery.

23  Q   And do you know whether or not you actually slid into

24  the intersection in the vicinity of East Avenue and Buffalo

25  Road?  Is that possible?

Havelka - Cross          134

1   A   Probably it's possible.

2   Q   Okay.  And then as you traveled down -- do you recall

3   attempting to make a turn on Downing Avenue, and as the

4   trooper testified, he actually saw you swerve and then come

5   back onto Buffalo Road?

6   A   I think he's mistaken because the last time he said I

7   was swerving in the road on 26th and Ash.

8   Q   Who told you that?

9   A   The first hearing when I was here.

10   Q   You were here for the first hearing?

11   A   Yes.

12   Q   There was no mention in the first hearing of 26th and

13   Ash?

14   A   Oh, I don't know when I heard that.  And then also they

15   said when -- that I have to go to make a statement to the

16   Police Station, and that night he was saying, like, he

17   stopped me because I was swerving on the 26th and Ash.

18   Q   Were you swerving on 26th and Ash?

19   A   I'm not sure; probably.  The roads was very, very

20   slippery.  I was going about ten, fifteen miles an hour, so I

21   just presume if he said it, but --

22   Q    So, it's likely you presume that you may have slid into

23   the intersection because of the conditions on East Avenue,

24   and you may have swerved while driving, and you say getting

25   onto East Avenue or 26th Street --

Havelka - Cross               135

1        MR. PATTON:  She didn't say she slid into the

2   intersection.  She said she swerved.

3        THE COURT:  Okay.

4   BY MR. PICCININI:

5   Q    You mean Buffalo Road and Downing Street?

6        It's possible that you swerved into that vicinity,

7   isn't it?

8   A    No.  Because I knew I was making a right turn, so I was

9   going very, very slow so --

10   Q    But, don't you recall, when you were attempting to make

11   that right turn, turning back and getting back onto Buffalo

12   Road for some reason?

13   A    I never go back on Buffalo Road.  I turn on Downing and

14   then I make a left on Prospect because I choose to go side

15   roads because the main roads are too slippery in the

16   wintertime.

17   Q    And when was the first time you talked to somebody and

18   told them about the direction that you traveled?

19        When is the first time you talked to somebody about

20   that?

21   A    I don't understand what you are saying.  Who is

22   somebody?

23   Q    How many weeks ago did you go and talk with the defense

24   team and tell them about the direction of travel?

25   A    That was in the beginning of when these things happened.

                    Havelka - Cross            136

1    Q    When?

2    A    Months ago.  I can't remember; to the end of March; in

3    the middle of March; in the beginning of April.  I don't

4    remember.  But, it was just after -- just after everything

5    happened.

6    Q    Did you take notes?  Did you jot anything down to show

7    them?

8    A    Yes; in that time, yes.

9   Q   Did you write any statements?

10  A   No.

11  Q   Did they write a statement for you to sign?

12  A   No.

13  Q   Okay.  But, you gave them notes of the travel that you

14  took, like a map or something?

15  A   Yes.

16      MR. PICCININI:  Do you have that map?

17  Q   Ma'am, I am going to show you what you -- what appears

18  to be something that you were involved in drafting.  And you

19  have testified here today that you traveled along East 18th

20  Street and actually turned on Downing Street.

21      Is that correct?

22  A   Correct.

23  Q   Where is Erie Street on this map?

24  A   Erie Street?

25  Q   Yes.

Havelka - Cross          137

1   A   Is not Erie Street.  Erie Street is somewhere 33rd and

2   State.

3   Q   And this is June Street over here?

4   A   Yes.

5   Q   Is East 18th Street connected with June Street?

6   A   Yes.  You can go -- no.  Like I said, East 18th became

7   Buffalo Road so it is the same.

8        So, if you go east on Buffalo Road, you can connect

9   with all these streets.

10   Q   Including June Street?

11   A   Yes.

12   Q   And can you explain why it is that if you are headed to

13   June Street, instead of coming down the road and turning on

14   June Street, you are claiming today you turned on Downing,

15   then left on Prospect, then onto June Street?

16   A   Because I had just said a minute ago I choose to go side

17   streets because it wasn't so slippery because the car -- is

18   not car going on the side streets so --

19   Q   Well, how is the side streets, that you are claiming now

20   that you went on, which would be 18th Street and Downing, how

21   is it any different from having travelled further up Buffalo

22   Road, and instead of attempting to turn on Downing, staying

23   on Buffalo Road and turning on June Street where you were

24   headed?

25  A   Well, is -- I turned on 9th Street to go on June Street,

Havelka - Cross            138

1   any street, like, from Downing to June Street is another six

2   blocks, four blocks.

3   Q   But, you were headed to June Street?

4   A   Yes.

5   Q   Why not turn on June Street?

6   A   I can go anyway I want to go.

7   Q   You can.  How about on all the other occasions when you

8   went from 448 East 14th Street to 2125 June Street, haven't

9   you gone the same direction on Buffalo Road and turned on

10  June Street?

11  A   Not all the time.

12  Q   Have you done that in the past, turned on June Street?

13  A   Yes.

14  Q   So, you have traveled in the multiple --

15  A   Coming from the other side of the city, yes.

16  Q   And coming from East 14th Street in the past, you go

17  from East Street to June Street before, you testified to

18  that?

19  A   Yes.

20  Q    And on those --

21  A    Maybe a couple occasions; maybe once or twice.

22  Q    And on those occasions, on other occasions you travelled

23  Buffalo Road, crossed over Erie East Avenue, crossed over

24  Downing and made a right on June Street, haven't you?

25  A    No.  Usually, I am going 14th Street to 12th Street, and

Havelka - Cross            139

1  from 12th Street, going east on 12th Street going to go

2  Franklin and over the bridge, because when you pass the

3  bridge over there is June Street and I avoid all the traffic

4  on Buffalo Road.

5       So, it is easy to go on 12th Street.

6  Q    And as far as the officer actually observing you on

7  June Street traveling -- driving on June Street after turning

8  off Buffalo Road, you are saying today that that's not

9  possible, that you did not turn onto June Street?

10  A    Exactly.  I don't turn on June from Buffalo.  I turn

11  from Prospect on June Street.

12  Q    Now, when Mr. Fleetwood got out of the vehicle, there

13  has been testimony today that a bag of crack cocaine fell

14   from his person.

15          What was he doing with the crack cocaine while he

16   was in the vehicle?

17   A   How am I supposed to know?  I never see it.

18   Q   Well, you are sitting there with him, right next to him.

19   He goes from one place at East 14th to another place on

20   June Street.  He has a baggie of crack that falls from his

21   person.  His sleeves have crack, scales and money located in

22   them, and you are indicating to the Court that at no point in

23   time did you know that you were transporting a drug dealer

24   around the city?

25   A   Are you asking me why I don't check his clothes before

Havelka - Cross              140

1   he get into the car?

2   Q   No.  I am asking you why does an individual with this

3   large quantity of crack cocaine on his person, including cash

4   and a scale, why does, first of all, that you are personally

5   the one transporting him in your private vehicle, although

6   not being paid for it, why is that -- why are you

7   transporting this individual with all this crack cocaine and

8   money and scales, why are you transporting him from one place

9   that's known for drug activity over to June Street that's

10  another place --

11  A   How I supposed to know he has all that stuff on him?

12  Q   I am asking you, why is it that you are transporting

13  him?

14  A   And I asking you, how come I know?  He just asked me for

15  a ride.  He don't tell me he has all this stuff, because if

16  he tell me that, I never give him a ride.

17  Q   How much money over time have you made from this

18  defendant, you transporting him around?

19  A   I don't know.

20  Q   How did you end up at his detention hearing?  How did

21  you get there?  How did you know about it?

22  A   Where?

23  Q   At the detention hearing in the courtroom across the

24  hall.  How did you even know about the detention hearing?

25  A   I don't know how I know.

                    Havelka - Cross              141


1   Q   Well, you didn't get arrested that night, did you?

2        Did you get arrested that night?

3  A   No.  They just told me to go to the Police Station to

4  give them a statement.

5  Q   And you did and you left, is that correct?

6  A   Yes.

7  Q   Mr. Fleetwood didn't leave because he was arrested?

8  A   I don't know if he left or not on that night.

9  Q   Then how in the world did you know that he had a

10  detention hearing across the hall that you supposedly showed

11  up at?  How did you know?

12  A   I don't supposed to show up.

13  Q   You said you were there?

14  A   Yes.  I just came on my own.

15  Q   But, how did you know about it?

16  A   Because probably when I contact or I was talking with

17  Mr. John Conley,(Spelled Phonetically), he told me.  Probably

18  that's why.

19  Q   Why were you there?

20  A   I was just curious.

21  Q   Weren't you curious because of the close personal

22  relationship that you had with the defendant and all the

23  dealings that you have had with him?

24  A   I don't have close personal relation because it is not

25   just me who was taking him around.  It's another few cab

Havelka - Cross              142

1   drivers who was taking him around.

2        So, we don't have personal relationship with

3   nobody.  It's just professional relation.

4   Q   And he is a good fare, he pays you cash and he tips you

5   well, doesn't he?

6   A   Everybody pays me cash.

7   Q   Okay.  And he tips you well?

8   A   Sometimes.

9   Q   Has he asked you to keep your mouth shut as to what you

10  are observing?

11  A   I'm sorry?  What?

12  Q   Have you been asked you to keep quiet in exchange for

13  the extra money that he's paying you, keep quiet about what

14  you are observing and what you hear inside your cab?

15  A   Like I said, he's not a much talker.  He don't talk too

16  much in the cabs and he don't have these conversations about

17  the drugs, or whatever, or money in the car.

18       So, I can say I can't help you with that.

19  Q    How many times have you traveled to Cleveland to pick

20  him up?

21  A    To pick him up, none.  Maybe to give him a ride from

22  there.

23  Q    And you have given him rides from here to Cleveland?

24  A    A few times.

25  Q    Other people with him when you traveled to Cleveland?

Havelka - Redirect            143

1  A    Sometime it is his wife and his son.  But, this

2  happened, like, once or twice because they missed a bus.  And

3  sometimes in the wintertime, the transportation they are not

4  good so --

5  Q    So, he called you personally and you drove him over

6  there?

7  A    Yes.

8        MR. PICCININI:  That's all I have, Judge.

9              REDIRECT EXAMINATION

10  BY MR. PATTON:

11  Q    Miss Havelka, you were at Country Fair twice on the

12  evening of March 2nd, 2005?

13  A    Yes.

14  Q   And what we saw on the videotape was the first time you

15  were there?

16  A   Yes.

17  Q   Mr. Piccinini showed you this map.  I guess I'll mark

18  it -- mark it as Defendant's Exhibit D and show it to you.

19      Do you recognize the handwriting of at least on the

20  map, the drawing of the map?

21  A   Yes.

22  Q   Whose is it?

23  A   It's mine.

24  Q   Do you remember when you did that?

25  A   I think just right away after everything happened; a

                    Havelka - Redirect          144

1  long time ago.

2  Q   And what does the map purport to show, or what's it

3  supposed to show?

4  A   Supposed to show the way what I was taking Mr. Fleetwood

5  from 14th Street to June Street.

6  Q   And from June Street onto where the stop occurred on --

7  A   Yes; on 26th Street.

8   Q    Did you intend this to be an accurate map of every

9   single road that was in Erie between 14th Street and

10  June Street?

11  A    Can you say that again?

12  Q    Did you try and put in every single cross road and side

13  road?

14  A    Oh, no; just the important one.

15  Q    And you testified that this was done shortly after you

16  were stopped on March 2nd, 2005, that you drew this shortly

17  thereafter?

18  A    Yes.

19  Q    And the map shows, does it not, that you, when you were

20  traveling on 18th Street, which we already established

21  earlier becomes Buffalo Road, that you turned right onto

22  Downing Street, correct?

23  A    Correct.

24       MR. PATTON:  Those are my questions, Your Honor.

25       MR. PICCININI:  Nothing in response, Your Honor,

                    Townley - Direct              145


1        THE COURT:  Thank you, ma'am.

2   (The witness was excused.)

3          MR. PATTON:  Your Honor, I just call Mr. Townley

4  just to --

5          THE COURT:  You think this is going to be a very

6  long?

7          MR. PATTON:  It shouldn't.  All he is just going to

8  do is explain where he got the videotape from and that he was

9  the individual who took the picture that's in Defendant's

10  Exhibit C.

11          THE COURT:  All right.

12          Would you come forward and be sworn, please?

13              * * * * *

14          JOHN TOWNLEY, having first been duly sworn,

15  testified as follows:

16          THE COURT:  Have a seat up here, please, give us

17  your name and spell your last name.

18          THE WITNESS:  My name is John Townley.

19  T-o-w-n-l-e-y.

20              DIRECT EXAMINATION

21  BY MR. PATTON:

22  Q   Mr. Townley, where do you work?

23  A   I'm an investigator with the Federal Public Defender's

24  Office.

25  Q    Do you work out of the Erie office?


                Townley - Direct               146


1   A    Yes, I do, the Erie office.

2   Q    How long have you been doing that?

3   A    With this office, about a year and a half.

4   Q    What did you do before you worked for this office?

5   A    I spent eighteen years as an investigator with the

6   Mercer County Pennsylvania Public Defender's Office.

7   Q    You were here in the courtroom when I showed what has

8   been marked Defendant's Exhibit A, which is a videotape from

9   Country Fair surveillance, is that correct?

10  A    Yes, I was.

11  Q    Did you obtain that videotape from Country Fair?

12  A    Yes.

13  Q    How did you go about doing that?

14  A    I contacted the Country Fair's Loss Prevention, spoke to

15  a Ron Baumgart, B-a-u-m-g-a-r-t.  He provided the video to

16  me, which is from the 12th and Parade Street Country Fair

17  store.

18  Q    And is the video that was shown from Defendant's

19  Exhibit A, is that the video that you obtained from Country

20  Fair?

21  A    Yes, it is.

22  Q    Do you know if they have stationary cameras at the

23  Country Fair?

24  A    Yes, they do.

25  Q    Were you informed as to whether or not that camera was a

Townley - Direct            147

1  stationary camera?

2  A    It was a stationary camera located outside the store

3  facing east towards Parade Street.

4  Q    Were there some video cameras that Country Fair had that

5  were not working properly on that date?

6  A    Yes.  The second surveillance camera, further south part

7  of the store also facing toward Parade Street, but it was not

8  functioning that night.

9  Q    I show you Defendant's Exhibit C.  Do you recognize that

10  photograph?

11  A    Yes, I do.

12  Q    Did you take that photograph?

13   A    Yes, I did.

14   Q    Where did you take it?

15   A    Miss -- at Miss Havelka's residence, which is on

16   East 7th Street.  Took it in March of 2005.  I believe it was

17   March 18th.

18   Q    And finally show you Defendant's Exhibit D, which is the

19   map Miss Havelka testified about drawing.

20        Were you present when this was done?

21   A    Yes, I was.

22   Q    Do you recall when it was done?

23   A    Yes.  That was after the detention hearing in this case,

24   which I believe was March 8, 2005.

25   Q    Was it actually done in Judge Baxter's courtroom?

                    Townley - Direct              148

1   A    Yes.

2        MR. PATTON:  Your Honor, I would move for the

3   admission of Defendant's Exhibits A, B, C.

4        THE COURT:  I got A and B.  What was C?  I mean, A

5   was the photograph.  B was the map.

6        MR. PATTON:  A.  I apologize.  B was what I marked

7   as the criminal complaint.  I'm sorry.  I am not introducing

8  that.  I move for A, which was the videotape.

9      THE COURT:  And C.

10      MR. PATTON:  And C which was the photograph of the

11  car.  And I guess I would move for the admission of D, which

12  is the diagram that Miss Havelka drew.

13      THE COURT:  Let me make sure I got it now.

14      MR. PATTON:  Okay.

15      THE COURT:  A is the videotape?

16      MR. PATTON:  Correct.

17      THE COURT:  Okay.  B are the maps?

18      MR. PATTON:  B was the criminal complaint, Trooper

19  Wagner's, which I just marked it for reference, but it's

20  already in the record.

21      THE COURT:  Okay.

22      MR. PATTON:  C is the photograph of the car.

23      THE COURT:  Okay.

24      MR. PATTON:  And D is the map or diagram drawn by

25  Miss Havelka.


                Townley - Cross            149


1      THE COURT:  Okay.  Then A, C and D are admitted.

2   BY MR. PATTON:

3   Q   Mr. Townley, regarding Miss Havelka's presence at the

4   detention hearing, did you speak with Miss Havelka before the

5   detention hearing?

6   A   Yes, I did.

7   Q   Did you inform her of the time and date of the detention

8   hearing?

9   A   Yes, I did; time, date and location.

10  Q   At one point, was our office looking into the

11  possibility of Mr. Fleetwood perhaps staying with her if he

12  was released on bond?

13  A   Yes.

14  Q   Did that ever end up occurring?

15  A   No, it did not.

16      MR. PATTON:  Those are my questions, Your Honor.

17              CROSS-EXAMINATION

18  BY MR. PICCININI:

19  Q   In the course of your investigation in the beginning of

20  this case, how in the world did you come up with the jitney

21  driver, Miss Havelka, being a possible suitable third-party

22  custodian person for the defendant to live with?

23      Where do you come up with a cab driver can be the

24  place -- can be the person where the defendant could reside?

25  A   I believe during the initial conversations, it was

Townley - Cross              150

1  indicated the possible source.  Obviously, that was not

2  presented at the detention hearing.  It must have been ruled

3  deemed not the best source.

4  Q   Deemed by who?

5      What I am wondering is, how extensive did you

6  discover the relationship between this defendant and

7  Miss Havelka, who testified here today, had been in his

8  story, of all people you guys look into the possibility that

9  the cab driver can be the person suitable for the defendant

10  to live with?

11      MR. PATTON:  Object, Your Honor.  These questions

12  and also answers to these questions would involve

13  attorney-client privilege information and Mr. Townley is part

14  of the defense team.

15      MR. PICCININI:  Judge --

16      THE COURT:  I think this goes to the credibility of

17  the previous witness.

18          MR. PICCININI:  I think the nature of the

19  relationship between Miss Havelka and the defendant, I think,

20  is highly relevant.

21          MR. PATTON:  But, Your Honor, if the source of that

22  knowledge is Mr. Fleetwood, that information is privileged

23  information and Mr. Townley is part of the defense team.

24          THE COURT:  We'll sustain.

25  BY MR. PICCININI:


                    Townley - Cross            151


1  Q    With regard to the videotape, isn't it true that when

2  you went and captured the videotape, there was no indication

3  that Miss Havelka had been at Country Fair on more than one

4  occasion that evening, was there?

5  A    On the tape itself, no.

6  Q    Well, was there any indication from the employees of

7  Country Fair that she had been there twice?

8  A    No.

9  Q    So, the tape that you presented is the only tape that

10  exists with regard to the vehicle traffic there in the

11  parking lot?

12  A    That is correct.

13  Q   And you would agree that nowhere on the tape does it

14  reflect Miss Havelka's vehicle being there other than the one

15  time that's reflected on the tape?

16  A   That would be correct.

17  Q   And you didn't ask Country Fair for another tape, nor

18  did you look for Miss Havelka's vehicle being present at a

19  second time prior to today, did you?

20  A   Repeat that, please.

21  Q   Prior to today, you did not take steps to see if

22  Miss Havelka's vehicle was at the Country Fair on more than

23  one occasion, did you?

24  A   Yes.

25  Q   You did do that?

152

1  A   The tape, on prior occasions, yes, to see if it shows up

2  on the tape.

3  Q   But, on the tape once.  Other than today, Miss Havelka

4  has never disclosed to you in any fashion that she was at

5  Country Fair on two occasions, has she?

6  A   Yes.

7  Q   In her previous statement, she stated that she had been

8  there on two occasions?

9  A   Yes.

10  Q   With regard to the claim that she went and visited her

11  husband, you are indicating on her prior statement that it

12  indicates that as well, that she went and visited husband?

13  A   Yes.

14       MR. PICCININI:  Your Honor, I request the

15  opportunity to review the defendant's previous statement to

16  the extent that it provides an inconsistent statement to what

17  she testified here today.

18       THE COURT:  The defendant's statement?

19       MR. PICCININI:  Not the defendant.  Excuse me.

20  Miss Havelka's statement.

21       THE COURT:  We'll deny the request.

22       MR. PICCININI:  That is all the questions I have

23  for Mr. Townley.

24  (The witness was excused.)

25       MR. PATTON:  We have nothing further, Your Honor,

153

1  and we have no further evidence to present, Your Honor.

2          THE COURT:  And nothing from Trooper Wagner yet?

3          MR. PICCININI:  Well, no, Your Honor, and I would

4    have been here through the entire defense case.  Other than

5    our request for him to go look for --

6          THE COURT:  All I want to know is, have you gotten

7    a report back on the missing notes?

8          MR. PICCININI:  I couldn't have because I am here,

9    Judge.  Can we reconvene at --

10         THE COURT:  Yes.  We will break for lunch and

11   reconvene at quarter of two.  It's quarter of one now.

12         MR. PICCININI:  Thank you, Your Honor.

13   (Court recessed at 12:45 p.m.)

14   (Court reconvened at 1:50 p.m.)

15         THE COURT:  Good afternoon.  Be seated, please.

16         MR. PATTON:  Good afternoon, Your Honor.

17         MR. PICCININI:  Good afternoon, Your Honor.

18         THE COURT:  Okay.  I think you said you had

19   concluded your presentation, Mr. Patton?

20         MR. PATTON:  That is correct, Your Honor.

21         MR. PICCININI:  Your Honor, at this time, I would

22   recall Trooper Rick Wagner.

23          THE COURT:  You're still under oath, trooper.  You

24  may take the stand and give us your name again, please.

25          THE WITNESS:  Yes, sir.  It's Eric D. Wagner.


                    Wagner - Redirect                154


1  W-a-g-n-e-r.

2                      * * * * *

3          ERIC T. WAGNER, having first been duly sworn,

4  testified as follows:

5                     REDIRECT EXAMINATION

6  BY MR. PICCININI:

7  Q    Trooper Wagner, the Court ordered that you produce any

8  notes that may have been reflected in the file concerning

9  this case.  And I am going to show you somehow what I have

10  marked as Government Exhibit 2 for identification and just

11  ask you to identify what is a three-page document?

12  A    Yes, sir.  The first page would be the notes that

13  Trooper Houk took on surveillance.  And the second page and

14  third page would be that interview that I mentioned with

15  Adrianna Havelka.

16  Q    And on the first page of the document with regard to

17  Trooper Houk's notes themselves, if we go through those, it

18  indicates the numbers 9:55, leaves 14th, and there is some

19  scribbling because I imagine these are contemporaneous notes.

20  At 10:07, the word June Street.  At 10:08, black male, East

21  house.  Under that, there is a word, it says June Street, all

22  in car.  2215, 26th and Wallace.  T.  Stop obscured plate.

23       And those are not your notes, but the notes of

24  Trooper Houk, is that correct?

25  A    That's correct.


                    Wagner - Redirect              155


1  Q    Then the only other notes with regard to you, would they

2  begin, as you testified earlier today, with notes of an

3  interview with Adrianna?

4       Would that be Adrianna Havelka, who testified here

5  today?

6  A    Yes, sir.

7  Q    After having -- excuse me.

8       On the second page and third page of Government

9  Exhibit 2, both of those would reflect your notes with regard

10  to that interview?

11  A    Yes.

12  Q    Now, in addition to having taken notes of the interview,

13  did you also conduct an interview, or excuse me, draft an

14  FBI FD-302 summary of interview with Miss Havelka?

15  A    Yes, sir, I did.

16  Q    And although at the top of the document it says

17  March 3rd, 2005, at 10:45 p.m. did you, in fact, interview

18  her on March 2nd, 2005, just after the incident occurred?

19  A    Yes, sir.

20  Q    And if I can draw your attention -- first of all, did

21  you discuss with Miss Havelka her claims with regard to the

22  route that she traveled on in any particular detail?

23  A    No.

24  Q    And was that a particular concern to you having her

25  describe for you the detail of the route that she took?


                    Wagner - Redirect              156


1   A    No, it wasn't.

2   Q    Towards the bottom of the 302 as the interview

3   progresses, did you have discussions with Miss Havelka

4   concerning her involvement with this particular defendant?

5   A    Yes, I did.

6   Q    And during the course of the interview, did Miss Havelka

7   state that she always discussed that they, including the

8   defendant, were distributing drugs, but she could not prove

9   it.  She stated that she was making money and that she was

10  not going to complain about making money?

11       Did she state that to you on the evening that this

12  event occurred?

13  A   Yes, she did.

14  Q   Now, earlier today, and with regard to her relationship

15  with Mr. Fleetwood, in the 302 -- excuse me -- further up in

16  the 302, does Miss Havelka indicate that she has picked up

17  Fleetwood up to twenty-five to fifty times or more over the

18  past year?

19  A   Yes.

20  Q   Now, in addition, she indicates in here that

21  Mr. Fleetwood was not present when she arrived at the Country

22  Fair, I believe in the vicinity of East 12th Street.

23       At any point in time in your interview, did she

24  indicate to you that she had gone to Country Fair on two

25  different occasions that evening and that she had gone to her

Wagner - Redirect              157

1   ex-husband's house?

2   A    Not that I recall.

3   Q    Okay.  Now, earlier this afternoon after you had

4   testified, Miss Havelka came in and testified with regard to

5   the route of travel she claims to have taken on the evening

6   that you made observations of her.

7         And I am showing you on the screen what's been

8   marked as Defendant's Exhibit D.  And this purports to be a

9   handwritten map provided by Miss Havelka to the Public

10  Defender's Office indicating her claim that she traveled down

11  14th street, then onto Ash Street, then onto 18th Street, and

12  she actually claims that she made a right-hand turn on

13  Downing Avenue, then onto Prospect Avenue, then to the June

14  Street location.

15        Do you see just generally what I am referring to

16  there on this particular exhibit?

17  A    Yes.

18  Q    Now, that obviously flies in the face of your testimony

19  that Miss Havelka, from Government Exhibit 1, actually

20  traveled on Buffalo Road and engaged in traffic violations

21  not only at the East Street intersection, but also at the

22  Downing Avenue location.

23    I am going to direct your attention to what's

24  obviously a conflict here.  With regard to Downing Avenue,

25  can you indicate to Judge Cohill whether or not, in your

Wagner - Redirect            158

1  observation in watching Miss Havelka that evening, whether

2  she, in fact, made a right-hand turn and traveled on Downing

3  Avenue?

4  A    Yes, I can.  Miss Havelka, in the white Cadillac, did

5  not turn down Downing Avenue.  She had put her turn signal on

6  to make a right-hand turn, partially turned onto Downing,

7  then swerved back onto Buffalo Road.

8  Q    And did she continue traveling what I believe would be

9  east on Buffalo Road?

10  A    Yes, she did.

11  Q    Now, you know that her Cadillac with the defendant

12  appears at 2125 June Street, is that correct?

13  A    That's correct.

14  Q    And surveilling officers observed the vehicle at

15  June Street, is that correct?

16  A    That's correct.

17  Q   Do you know, other than not turning on Downing, and

18  other than knowing that there was a traffic stop, violation

19  here, do you know how she got to 2125 June Street after

20  crossing over Downing Street?

21  A    No.  At this time, I don't recall if I physically saw

22  her turn down June Street.

23        So, to answer your question, I don't have

24  recollection of whether she turned on June off of Buffalo

25  Road.

Wagner - Recross          159

1  Q   But, you know from the investigation that she was parked

2  out in front of 2125 June Street so she had to have been on

3  June Street?

4  A   That's correct; and the car was southbound on June

5  Street.

6  Q   All right.  But, do you know, in your testimony here

7  today, that she, in fact, and you recall specifically having

8  observed that she did not, on this evening, turn down or turn

9  right onto Downing Street as she indicated to the Court

10  earlier today?

11  A   That's correct.

12  Q    Now, are there other ways to go along Buffalo Road to

13  get to June Street?

14  A    I do believe there might be roads or streets in between

15  Downing and June that would lead that -- leave that

16  possibility.

17  Q    All right.  But, as far as the traffic observation you

18  made, it occurred here at Downing Street and 18th -- excuse

19  me -- Buffalo Road and her vehicle ends up at 2115

20  June Street?

21  A    That's correct.

22       MR. PICCININI:  I have nothing further, Your Honor.

23       THE COURT:  Mr. Patton.

24       MR. PICCININI:  Your Honor, I would move to admit

25  Government Exhibit 2, the three-page document.


                    Wagner - Recross              160


1        THE COURT:  Two is admitted.

2        Is that both the interview with Miss Havelka and

3   the FBI report?

4        MR. PICCININI:  I'm sorry, Your Honor.  I may not

5   have marked the FBI 302, which would be Government Exhibit 3

6   for identification.

7        THE COURT:  That would be three then?

8        MR. PATTON:  The rough notes.

9        MR. PICCININI:  The rough notes would be the three

10  pages that were Government Exhibit 2, and Government Exhibit

11  3 would be the FBI 302 of Miss Havelka.

12        THE COURT:  Government's Exhibits 2 and 3 are

13  admitted.

14        MR. PICCININI:  Thank you.

15                    RECROSS-EXAMINATION

16  BY MR. PATTON:

17  Q   Trooper Wagner, the 302 that you wrote that we referred

18  to in your original testimony, do you recall that?

19  A   Yes.

20  Q   That 302 actually indicates that the authors are

21  yourself, Rich Houk, H-o-u-k, Robert Toski, T-o-s-k-i, and

22  Jeff Green, is that correct?

23  A   Yes.

24  Q   So, this 302 is a collaborative effort?

25  A   That's correct.

                    Wagner - Recross            161

1  Q    And on the first page of Government Exhibit 2, which are

2  Trooper Houk's notes, correct?

3  A    Correct.

4  Q    Under the 9:55 entry, it has, leaves 14th, and some

5  stuff that I think indicates white female and two black

6  males, and then it has FJB-7541, correct?

7  A    Yes.

8  Q    And the FJB 7514 is the correct plate number for the

9  white Cadillac Miss Havelka was driving that evening,

10  correct?

11  A    Yes.

12  Q    And then further down the page at 22:15, which would be

13  10:15 p.m., is that correct --

14  A    Yes.

15  Q    -- Trooper Houk has written down 26th and Wallace, T

16  stop, meaning traffic stop, obscured plate, correct?

17  A    Yes.

18  Q    And then has an arrow down that says Officer Fuhrman,

19  Royce Smith, is that correct?

20  A    Yes.

21  Q    At the time of the detention hearing in this case, your

22   affidavit and -- for the criminal complaint stated that

23   the -- other than the obscured plate, that any other traffic

24   violations you witnessed occur happened while the white

25   Cadillac was westbound on East 26th Street, correct?

162

1        That's what your affidavit said?

2   A   Yes.

3   Q   And you never testified to the contrary at the detention

4   hearing, correct?

5   A   That's correct.

6   Q   And Downing Street and Buffalo Road were never discussed

7   at the detention hearing, is that correct?

8   A   That's correct.

9   Q   With regard to your 302 of Miss Havelka, did you ever

10  ask Miss Havelka if she had been at Country Fair twice on the

11  evening of March 2nd?

12  A   I don't recall.  I don't believe I did.

13        MR. PATTON:  Those are my questions, Your Honor.

14        THE COURT:  Thanks, trooper.

15        THE WITNESS:  Thank you, Your Honor.

16  (The witness was excused.)

17          MR. PICCININI:  Your Honor, I have nothing further

18   to offer.

19          THE COURT:  Do you want to present an argument,

20   Mr. Patton?

21          MR. PATTON:  Judge, I know we have been here for a

22   long time today and I apologize if we went overboard on the

23   cross and recross.

24          But, with regard to the traffic stop, I'll start in

25   order with the reasons given.  With the obscured plate, we

163

1   have no idea where Houk and Toski were located when they said

2   they couldn't see the license plate on the white Cadillac.

3          So, there is no way that you can know if they were

4   in a position where you would reasonably be able to expect to

5   see the license plate on a vehicle.

6          Well, if they are a hundred feet away or, for all

7   we know, a hundred fifty feet away, maybe all they saw was

8   trying to get a brief view of it or they are located so far

9   away that they just can't see.

10          What we do know that is Trooper Wagner, as he was

11  able to drive past at a normal rate of speed without

12  stopping, was able to read the plate on the white Cadillac

13  and was able to confirm that it was the correct plate

14  registered to that vehicle.

15        Now, the government cites a Pennsylvania case

16  interpreting the obscured plate statute saying that, well, if

17  the officer has to come up, right up to the vehicle to read

18  the plate, that that's a violation of the statute.

19        But, in that case, the guy was driving a 4X4 pickup

20  truck that was splattered in mud, the Pennsylvania State

21  Police trooper was driving down the road following the truck

22  at a couple car lengths and couldn't see the plate.

23        So, she stopped the individual and was only able to

24  read the plate once the vehicle was stopped.  She got out of

25  the vehicle, walked up to the vehicle and looked at the

164

1  plate.  And the Superior Court found that that did violate

2  the statute.

3        But, that's not what we have here.  And you saw the

4  videotape of the car.  There just was virtually no snow on

5  the car.  And Trooper Wagner testified there wasn't snow on

 6  the hood of the car, there wasn't snow on the roof or the

 7  trunk of the car, but somehow there is some snow on the

 8  license plate that obscures it.

 9        And you have seen the picture of the car showing

10  the license plate is recessed into the trunk to help prevent

11  snow from piling up on it.  And I would submit that there

12  just wasn't a basis for stopping this vehicle for a violation

13  of the Pennsylvania Motor Vehicle Code for driving with an

14  obscured plate.

15        And in Trooper Houk's rough notes, he indicates

16  that that was the sole basis for the stop, and these were

17  contemporaneous notes written that evening which, I would

18  submit to you, is the best evidence of what the basis of the

19  stop was.  It flat out says traffic stop for obscured plates.

20        As far as the Downing Street incident, Miss Havelka

21  wrote this map in Judge Baxter's courtroom immediately after

22  the detention hearing in this case on March 8th of this year.

23  At that time, the information the defense had was from

24  Trooper Wagner's affidavit that said any traffic violations

25  other than the obscured plate occurred while the white

165

1  Cadillac was driving west on East 26th Street.

2      So, Miss Havelka simply has absolutely no reason,

3  at the time she is drawing this map that's documenting the

4  route that she followed, to somehow lie about her turn onto

5  Downing Street.

6      I mean, as far as she -- show knows, as far as I

7  know as a defense attorney, you know, the traffic violations

8  happened on East 26th Street.  So, I mean, she just has

9  absolutely no reason whatsoever to say that she turned on

10  Downing Street if she really didn't; I mean, no reason at

11  all.  And at that point in time, all that we are just doing

12  is an investigation to try and find out what her route was

13  and she writes it down.

14      And so I would submit that I am not trying to say

15  that Trooper Wagner is intentionally coming in here and being

16  dishonest with Your Honor, but I believe his memory is just

17  wrong because this is Miss Havelka saying four -- excuse

18  me -- six days after this event occurred, she is writing this

19  up with no reason to lie about this; I mean, absolutely none.

20      And even if you found that she did try and turn

21  onto Downing and come back on Buffalo Road, which I submit

22  there just isn't evidence to support that, you heard, even

23  under Trooper Wagner's version of the events, there weren't

24  any other cars around.

25       So, it didn't recklessly endanger any other person

166

1  or property, and the reckless driving statute that is even

2  cited in the government's motion on this says that it's

3  careless driving or reckless driving if you recklessly

4  endanger person or property.  But, if she didn't interfere

5  with another vehicle -- and he was clear on that -- that

6  simply can't be a traffic violation.  If he is wrong about

7  the Downing Street thing, he can be wrong about the East

8  Avenue and 18th Street intersection.

9       If he's wrong about Miss Havelka turning onto

10  Downing Street, then, you know, I would submit that you can't

11  rely on the testimony regarding the intersection and East

12  Avenue.

13       And, Your Honor, if you are driving at night behind

14  a vehicle and you have any distance at all, I mean, the

15  ability to have the depth perception to tell when a car

16   physically goes into the intersection or doesn't go into the

17   intersection, it is very, very difficult, especially if you

18   are trying to drive at the same time.

19         I would just submit that having a police officer

20   testify as from some unknown distance, he didn't even know if

21   there was a car between his vehicle and the Cadillac at the

22   time they approached the East Avenue intersection, that he

23   just, you know, isn't capable of reliably being able to

24   determine does the vehicle go into the intersection or stop

25   short of the intersection.

167

1         So, those are the three areas that have been put

2   forth for the traffic stop.

3         As far as whether there was reasonable suspicion to

4   stop the vehicle to investigate drugs, the EAGLE Task Force

5   had information that drugs may be being dealt out of the 448

6   East 14th Street address.  But, that address is a multi-unit

7   complex that has multiple apartments in it.  And as Trooper

8   Wagner testified, EAGLE did not have any specific information

9   as to which unit the drugs were supposedly being dealt from.

10   And the CI didn't give him that information and the trash

11   pulls did not give him that information.

12          While the trash pulls indicated there was some drug

13   activity in one of the units at that address, it did not

14   identify any particular unit.  And as Trooper Wagner

15   testified, to get through the doors of the individual units,

16   you have to go in through a common door.

17          So, seeing somebody go out a common door at 448

18   East 14th Street does not give you any information about even

19   what unit they are coming from and they don't even know what

20   unit is supposed to be involved in dealing.

21          So, under the government's theory of defense, if

22   the police have reason to believe that somebody in a, you

23   know, ten-apartment unit complex is dealing drugs that

24   provides reasonable suspicion to stop anybody who comes out

25   of that amount complex because they may be going to the unit

168

1   that is being used to deal drugs and that, of course, just

2   can't be correct.

3          As far as going to June Street, the only evidence

4   you have heard about June Street is that on one occasion

5   about a month and a half prior to March 2nd, 2005, a

6   controlled purchase was made out of that house by some

7   individual.  We weren't told whether that individual was a

8   resident of that house, whether that individual had just come

9   and was a visitor to the house at the time of the controlled

10  purchase.  You have none of that information.

11         And so simply saying that one controlled purchase

12  has been made out of a house at some point in time a month

13  and a half ago, again, cannot form the basis of believing

14  that anybody who goes into and out of that house is involved

15  in drug distribution.

16         And I would submit that is why, when Trooper Houk

17  wrote his notes and said -- put down what the basis of the

18  stop was, he put down it was a traffic stop because those

19  guys knew that they didn't have reasonable suspicion to stop

20  the car and that's why in the affidavit for the criminal

21  complaint, that says the basis for the stop was a traffic

22  stop.

23         Now, I understand that the case law says the

24  determination of whether or not there is reasonable suspicion

25  is an objective standard and that even if the individual

1  officers involved didn't subjectively believe they had a

2  reasonable suspicion, you, as the reviewing Court, can look

3  at the facts and say, well, there was a reasonable suspicion.

4        But, I would submit to you that when officers from

5  the Drug Task Force are saying we got him on a traffic stop

6  because they don't believe they have reasonable suspicion,

7  it's a pretty good indication what a reasonable officer

8  believes under the circumstances.

9        If they really thought they had reasonable

10  suspicion to do a drug stop, then they don't have to screw

11  around with an obscure plate or supposedly going into an

12  intersection or turning onto Downing and coming off -- they

13  would have no reason for doing that.  All you got to say is,

14  I came out of 14th Street, went to June Street, we know those

15  are drug places, call in the cops and stop them.

16        So, I submit there was no reasonable suspicion to

17  stop them for a drug investigation.

18        If you find that there was reasonable suspicion to

19  do a traffic stop, but not reasonable suspicion to do a drug

20  investigation, I would submit that getting Mr. Fleetwood out

21  of the car so that he can be spoken to about the drugs, to

22  follow up on the drug investigation, is outside the scope of

23  the traffic stop.

24        And Officer Smith's testimony was absolutely right

25  on point and completely explanatory on this issue.  He

170

1  testified that the first thing they want to do is get control

2  of the situation.  They had control of the situation by

3  having the people stay in the car put their hands up.

4        He said the reason he got Fleetwood out of the car

5  was the thought that there was reasonable suspicion that

6  Fleetwood was involved in drug dealing and Fleetwood didn't

7  give an I.D. so he wanted to talk to him about the drug

8  activity, and that's why he was asked to get out of the car.

9        When I specifically asked him about, did you want

10  to talk to him about the traffic stop, his response was, he

11  wasn't the driver.  I didn't want to talk to him about the

12  traffic stops.  And Smith never once, never said we had to

13  get Fleetwood out of the car for officer safety.

14        You know, what he said was, I'm the one that

15  decided to get him out of the car and told Fuhrman.

16  Everybody else pretty much agreed with it.  He wanted him out

17  of the car to investigate the drug investigation -- or to

18  further the drug investigation.  And that is outside the

19  scope of the traffic stop.

20      And so I would submit that, you know, the stop was

21  bad, and it's a -- and if the stop is bad, then any of the

22  statements that Mr. Fleetwood gave afterwards would have to

23  be suppressed.

24      THE COURT:  Thank you.  Mr. Piccinini.

25      MR. PICCININI:  Your Honor, there are multiple

171

1  reasons for law enforcement officers to pull over this

2  vehicle.  All of them fit within the totality of the

3  circumstances.

4      And counsel poses the question that there was no

5  reason for the officers to have listed traffic violations if

6  they had a drug investigation, but there is one reason, and

7  that is, if it is the truth.  That without disregarding the

8  facts, the law enforcement officers came in here and

9  testified to their accurate observations concerning what they

10    saw, not because they needed to make something up to do the

11    traffic stop, because it was the truth.

12            Because if they are going to make it up, then why

13    add three traffic violations?  Why do the obscured plate,

14    have specific testimony concerning the two locations where

15    flagrant traffic violations occurred and not just stick with

16    just that?

17            The truth of the matter is, it was all

18    encompassing.  When you look at the traffic stops that

19    Trooper Wagner's testimony -- which is very clear.  He is not

20    a guy talking about things other people reported to him.  He

21    was the person behind Miss Havelka's vehicle.  He followed

22    Miss Havelka.  He --

23            Actually, we'll start with the obscured plate.  Two

24    other officers observed the obscured plate and related the

25    information to Trooper Wagner, and we talk about some

172

1    contemporaneous case of what occurred that night.  Well, here

2    it is within minutes of the traffic stop.  You have a police

3    officer writing stop, obscured plate.  And why is that on

4    Houk's report?  Because Houk's the one that initially saw the

5  obscured plate.

6        Houk and Toski are so concerned about the plate

7  being obscured that they actually end up calling in the plate

8  on two occasions.  And what does Trooper Wagner do?  He also

9  drives by.  He is able to discern the plate because he had

10  some history about it.  But, he specifically testified about

11  that time I even observed it, it was obscured as well.

12        But, then after the vehicle, or in addition to the

13  vehicle having an obscured plate, he travels right along

14  Buffalo Road, is right behind the vehicle.  He sees her, in

15  light of the conditions, actually slide out into the

16  intersection and actually is concerned that she has burned

17  the surveillance.

18        These are his recollections of what he thought and

19  perceived at the moment.  They are very credible.  I thought

20  she burned the surveillance and that she was just going to

21  run the red light.  She had proceeded into the red light to

22  stop.  Even she says that it is possible, because of the

23  conditions, she could have slid into the intersection.  But,

24  nonetheless, it's a per say violation of the traffic statutes

25  here in Pennsylvania.

1      And then going down on Downing Avenue, whether Miss

2   Havelka is lying or not, this is a route with an individual

3   who she has traveled with on multiple occasions.  Whether she

4   turned, whether she recalls today turn on Downing Avenue or

5   not, why would it be significant to her today, Judge, whether

6   she turned on Downing or turned on one of these other side

7   streets or turned on June Street?

8      To her, it wouldn't, but to law enforcement

9   officers specifically watching, and not only does he know she

10  didn't turn, he knows she committed another traffic violation

11  swerving and turning back onto the roadway.

12      His focus for testimony purposes was that there was

13  a traffic violation here.  She could have turned on June.

14  She could have turned on these side streets.  He doesn't

15  recall having seen that.  The point was not where she turned.

16  The point was whether she committed a traffic violation.

17  But, you couple all that with the nature of the

18  investigation, that trooper Royce Smith testified that this

19  is the area that he patrols on a regular basis, that it is

20  known to law enforcement for its high incidence of crimes and

21  drug dealing activity, that in that context, a veteran law

22  enforcement and narcotics detectives from the EAGLE Task

23  Force know that the two locations that are important here

24  448 East 14th Street and 2125 June Street, some distance

25  away.

174

1        What is significant in this case is that this

2  vehicle was affiliated with both of those addresses on this

3  night prior to the traffic stop.  You got a bad narcotics

4  distribution area.  You got Eagle Task Force officers with CI

5  information that drug dealers from Cleveland are dealing

6  drugs in this vicinity.  You got this location on East 14th

7  Street where we have pulled garbage, and it doesn't really

8  matter which location in there had it outside of that

9  particular structure, multiple baggies consistent with the

10  distribution of cocaine coming from that residence.  And then

11  where does the vehicle go?

12        We don't just do this separately.  It's all part of

13  the same case with all that information, that vehicle with

14  these two men who engage in activity that the officer

15  testified is consistent with drug dealing activity, the brief

16  presence at the residence, leaving the residence, getting

17  back in the vehicle and moving to a different location, by

18  itself, innocent, but in the drug trade, it's an indication,

19  in the whole context, the totality of what is going on, then

20  travels over to June Street, commits vehicle violations on

21  the way, gets to June Street.

22      What do we know about June Street?  We know that's

23  a place known for the sale of crack cocaine.  And how do we

24  know it?  Because we had a previous sale of crack cocaine

25  from the -- that residence within the previous sixty days of

175

1  the investigation.

2      So, coupled with all that information, not only do

3  they have probable cause to ask the Erie Police to help with

4  the stop, traffic stop, they have reasonable suspicion to

5  actually stop the vehicle based on the drug investigation.

6      Once the vehicle is stopped -- counsel is wrong.

7  Even if you don't find reasonable suspicion, you can't

8  discount everything else.  Law enforcement officers knew

9  about the drug dealing nature of this interaction.

10          Let's say it's just the traffic stop.  Now, it's

11   just a traffic stop.  We got a person in the front and

12   another man in the back and another guy up front in the

13   location in the area where it was at ten o'clock at night who

14   can't provide any identification.

15          Royce Smith did accurately state that there was a

16   concern, as there always would be for officer safety, and you

17   need to extract the person out of the vehicle to be able

18   to -- how about this? -- just to identify him?

19          Why does he not have any identification?  That's a

20   legitimate purpose for taking him out of the vehicle, and

21   taking him out of the vehicle to further the drug

22   investigation is legitimate, as well the crack that fell off

23   of him and all the rest of the crack that was located on his

24   person.

25          None of it should be suppressed because there was

176

1   no violations, and the statement is admissible as well.

2          THE COURT:  Thank you.

3          It's clear to me here that the motion to suppress

4    must be denied.  I found Trooper Wagner to be a credible

5    witness.  We had the question of the partially obscured

6    license plate.  But, on top of that, three other reasons for

7    a traffic stop, let alone the drug investigation.

8          Whether or not she slid into the intersection or

9    entered the intersection when the light against her was red,

10   her signaling a turn and then swerving back in.  Then, of

11   course, when the stop was made, we had Mr. Fleetwood with no

12   identification, a drug scale, I think the report said

13   something like $1,900 in cash in his pockets.  Then he gives

14   the officers a false name.

15         On top of that was the question of the earlier

16   trash pull where cocaine baggies were found.  And in addition

17   to that, from that same address, we had had the drug buy by

18   an undercover or confidential informant.

19         So, to use the term totality of circumstances, I

20   think certainly the totality here adds up to a legitimate

21   stop and arrest of Mr. Fleetwood.

22         So, we will deny the motion to suppress.

23         Court is in recess.

24   (Court recessed on Wednesday, October 12, 2005,

25   at 2:20 p.m.)

file:///A|/FLEET-1.TXT

177

1                    * * * * *

2          I certify that the forgoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4

5                         S/Michael D. Powers
                          Michael D. Powers
6                         Official Reporter

7          *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25